Randy W. RESS, Respondent,

v.

ABBOTT NORTHWESTERN HOSPI-
TAL, INC., Petitioner, Appellant,

Commissioner of Jobs and
Training, Respondent.

No. C8–88–2208.

Supreme Court of Minnesota.

Dec. 8, 1989.

Robert S. Halagan, Minneapolis, for appellant.

Phillip I. Finkelstein, St. Paul, for Randy Ress.

Donald Notvik, Asst. Atty. Gen., St. Paul, for Com'r of Jobs & Training.

YETKA, Justice.

Randy Ress was fired as a registered nurse by Abbott Northwestern Hospital for allegedly exceeding the bounds of his nursing authority and for refusing to follow the orders of a physician. He was disqualified for unemployment benefits by the Department of Jobs and Training. On appeal, a referee reversed the department and awarded benefits. The commissioner reversed the referee, denying benefits; the court of appeals reversed the commissioner and awarded benefits. We reverse the Minnesota Court of Appeals, 438 N.W.2d 727, and reinstate the commissioner's order denying benefits.

The facts in this case are as follows. Randy Ress worked as a nurse at Abbott from May 5, 1980, until Abbott discharged him on February 5, 1988. His final position at Abbott was as a registered nurse in intensive cardiac care. At that time, Sandi Martin, head nurse of intensive cardiac care, was Nurse Ress's immediate supervisor and had been so for approximately 3 years. She terminated Nurse Ress because he acted outside the scope of medical and nursing practice and refused to follow doctor's orders in an emergency situation with a patient on January 21, 1988.

The patient involved in this incident was a very sick, elderly woman suffering from numerous lung problems. She was on a ventilator and required high concentrations of oxygen. A ventilator mechanically assists the patient to breathe. The patient was on "do not resuscitate" (DNR) status. DNR status means, generally, that the primary objective is to keep the patient comfortable.

Dr. John Mielke, her primary attending physician, described the patient's condition in his statement. She suffered from severe restrictive lung disease secondary to kyphoscoliosis. Kyphoscoliosis is a deformity of the spine in which the spine is S-shaped and humped. 2 J. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* K–20 (1981). She entered the hospital with pneumonia in both lungs and numerous complications. Pneumonia causes congestion in the lungs which hinders or stops the exchange of oxygen and carbon dioxide.

An endotracheal tube (ET tube) placed in the patient's airway through her mouth connected her to the ventilator. She was also monitored by a Swan Ganz catheter, a catheter with a little balloon on the tip placed directly into the heart through a vein for monitoring blood pressures. Ideally, the catheter should be in the pulmonary artery. Critical care nurses must watch to make sure the catheter does not become permanently "wedged" in the pulmonary artery so as to close it off and possibly cause the vessels to rupture. They do this by watching the "wave forms" on the monitor; if they are "dampened or lost," the catheter may be wedged.

Nurse Ress was responsible for the patient's care on January 21, 1988. Three other nurses assisted him. At approximately 10:40 p.m., the instrument monitoring the patient's heart showed that she had lost the "wave form" indicating proper placement of the Swan Ganz catheter. Following this, the patient suffered "gross hemoptysis" from the ET tube. Hemoptysis means bleeding from the lungs or the airway. 2 J. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* H–45 (1981). In other words, Nurse Ress testified, blood forcefully shot out of the ET tube.

Nurse Ress called for help. He then began suctioning the ET tube in accordance with established protocol; that is, he opened the little cap on the end of the ET tube and suctioned the blood through the opening. That way, the patient remains attached to the ventilator.

Dr. Stevens, the first-year resident physician, arrived. He recalled that the patient had bled from her ET tube a few days earlier probably because, in light of the patient's abnormal posture, the rigid ET tube had caused irritation. Thus, when he observed the bleeding again, he suggested that Nurse Ress move the ET tube slightly to relieve any possible irritation. Nurse Ress refused, commenting on how difficult it was to place the ET tube in this patient. Nurse Ress suggested instilling epinephrine into the ET tube as an alternative. Dr. Stevens answered that he wanted to use vasopressin. Nurse Ress stated that vasopressin was not available at the nursing unit and ordered one of the nurses to get some epinephrine. Dr. Stevens eventually agreed to use the epinephrine.

According to Abbott's established protocol, when a nurse notices blood in the ET tube, the nurse should suction the airway with a suction catheter to open it. Head Nurse Martin testified that Nurse Ress should have continued to follow this protocol. If that failed, he should have contacted an attending physician or an anesthesiologist. Instead, Nurse Ress created and initiated a procedure outside any established protocol: he poured saline over ice, rendering it non-sterile, and lavaged[1] the ET tube for approximately 15 to 20 minutes in an attempt to stop the bleeding. During these 15 to 20 minutes, the patient was not connected to the ventilator.

While protocol allows that it is appropriate in some circumstances to instill small amounts, *not exceeding 3 to 5 cubic centimeters*, of *sterile* saline into the ET tube in order to break up thick secretions and facilitate suctioning out the tube, it does not call for iced saline. It is not clear how much saline solution Nurse Ress used. The record does support that, a number of times over a period of about 15 to 20 minutes, Nurse Ress instilled *at least 5 cubic centimeters* of *non-sterile* iced saline into the patient's ET tube and then suctioned. Nurses use a 5 cc saline lavage capsule

when following the proper protocol. The capsule works better than a syringe because, with a syringe, the nurse will probably have to remove the patient from the ventilator as Nurse Ress did in this action.

Dr. Stevens did not order nor comment on the lavage. He left to consult with a more experienced resident for about 10 minutes, during which time Nurse Ress continued to lavage the ET tube. Dr. Stevens returned and ordered Nurse Ress to discontinue the lavage because the iced saline could cause a blood clot. In his statement, Dr. Stevens stated that Nurse Ress answered, "I'm just about done anyway, the bleeding seems to be slowing down."

Iced lavage of the tracheal tube is not an accepted medical or nursing procedure. The non-sterile solution could have caused infection in an already gravely ill patient. Further, pushing liquid into a patient's lungs would decrease the patient's oxygen level, creating a state, in Head Nurse Martin's words, similar to drowning.

Dr. Mielke, the attending physician for the patient involved in this action, expressed concern to Martin about Nurse Ress's conduct. He submitted a letter stating:

It is my professional opinion that *several of the actions, of the nurse in question, were dangerous and may have contributed to the speed at which this patient died.*[2] At this point in the patient's course she was quite ill but we had not limited our current measures in hopes that she may regain her ability to oxygenate. Certainly the installation of 30–40 cc of saline into the tracheal bronchial tree on several occasions was absolutely contraindicated and could have only worsened the patient's situation. *No physician would have ordered this treatment had the question been raised by the nurse.* In addition, it is well known that people on high doses of PEEP [positive and expiratory pressure] are very susceptible to profound hypoxia

---

1. "Lavage" means to wash. A solution is instilled in the tube and then suctioned out. Lavage with a *sterile* saline solution is typically used for a gastrointestinal bleeding.

2. The patient died on the day following the incident, January 22, 1988.

[a deficiency of oxygen reaching the tissues of the body] when disconnected from the respirator. This might have precipitated life threatening arrhythmias[,] exacerbated the patient's shock and certainly have caused significant discomfort to the patient.

(Emphasis added.)

In a letter to Head Nurse Martin, Dr. Hale, chairperson of the Critical Care Committee and a pulmonologist on staff at Abbott, stated: "Iced saline lavage for patients with hemoptysis is not an acceptable mode of therapy. The practice could be dangerous and life threatening in any patient." A pulmonary clinic nurse specialist at Abbott, Ruth Sohl–Krueger, elaborated on the nurse's responsibility in this situation, stating that lavage with large quantities of iced saline

is not a safe independent nursing intervention for the following reasons:

1. large volumes of fluid are a physical obstruction

2. you do not want to clot the blood in the airway since this will cause obstruction

3. this process would require long periods off of the ventilator—dangerous to someone who is so marginally oxygenated[.]

(Emphasis in original.)

Shortly after the bleeding incident, Dr. Stevens ordered a chest x-ray. Nurse Ress refused, arguing that the patient was comfortable and he did not want to disturb her until the family had visited. Nurse Ress said that he would order the x-ray after the family had seen her in 5 to 10 minutes. Dr. Stevens came back twice, insisting that the patient needed an immediate x-ray to diagnose the cause of the bleeding for appropriate treatment. Dr. Stevens told Nurse Ress that the family could see her after the x-ray. Nurse Ress told Dr. Stevens that he would ask the third-year resident about the x-ray. Dr. Stevens said that Nurse Ress should talk with him about the x-ray; in response, Nurse Ress walked away. The chest X-ray was done around midnight, but Dr. Stevens had left Abbott and did not read it. No one read the x-ray until noon the next day.

The protocol for dealing with Swan Ganz catheter wedging and rupture of the pulmonary artery both call for chest x-rays. The latter protocol calls for an immediate chest x-ray. However, Dr. Mielke, the attending physician, found the refusal to honor the order to obtain a chest x-ray "a minor point in comparison" to initiating non-sterile, iced saline lavage of the ET tube.

■ Nurse Ress, as a registered nurse, is limited by his license to initiating only those procedures established in Abbott's written protocol or approved by a physician. A registered nurse who initiates procedures which are not established or approved is, in effect, practicing medicine and violating his license. As noted above, ample evidence supports the commissioner's findings that Nurse Ress initiated an unauthorized and potentially life-threatening procedure.

Nurse Ress knew his actions were not authorized by the established protocol. He felt that his actions were justified because he had "never seen this type of forceful bleeding before." Nurse Ress also complained that Dr. Stevens had offered no help during a crisis situation and, by his silence, acquiesced in the iced saline lavage. Another nurse corroborated this statement. Nurse Ress did not, however, personally contact or ask another nurse to contact another physician during the crisis.

In sum, Nurse Ress stated in his defense at the referee hearing:

I feel that I was in a situation that was definitely a life and death crisis. I feel that my main concern was for the patient. I feel that I had asked several times for the assistance of my peers and also to Dr. Stevens. I feel that no advice or no directorship was offered by him, and I feel that under that under [sic] this unconventional situation that I did the best possible that I could to save the patient from drowning in her blood * * *.

Head Nurse Martin commented that Nurse Ress had a pattern of overstepping his bounds as a nurse starting in 1982.

Indeed, several other supervisors had warned Nurse Ress about this behavior. For example, in 1982, the emergency room head nurse stated on Nurse Ress's evaluation, "Be wary of overstepping boundaries of nursing treatment and interventions." Further, in 1984, the preceptor [3] in the post-anesthesia recovery room (PAR) criticized Nurse Ress for over-medicating patients, inaccurately assessing patients, and failing to contact a physician when necessary. Jennifer Helling, the head nurse of PAR noted that several preceptor evaluations described Nurse Ress as "overconfident of his clinical skills and knowledge base" and stated that Nurse Ress "attempts to accomplish tasks that he is not comfortable with, without asking questions." Abbott transferred Nurse Ress from the PAR because of these incidents.

■ The employer has the burden to prove, by the greater weight of evidence, that an employee has committed "misconduct" so as to be disqualified from receiving benefits under Minn.Stat. § 268.09, subd. 1(b) (1988). *Lumpkin v. North Central Airlines, Inc.*, 296 Minn. 456, 460, 209 N.W.2d 397, 400 (1973). On appeal, because of the unemployment compensation act's remedial nature, we narrowly construe the disqualification provisions. *Smith v. Employers' Overload Co.*, 314 N.W.2d 220, 221–22 (1981). This court will review the commissioner's fact findings in the light most favorable to the decision below and will not disturb them if there is evidence reasonably tending to sustain those findings. *McGowan v. Executive Express Transp. Enter., Inc.*, 420 N.W.2d 592, 594 (Minn.1988); *White v. Metropolitan Medical Center*, 332 N.W.2d 25, 26 (Minn.1983). The commissioner's conclusions of law, however, do not similarly bind us. *McGowan*, at 594. The determination of whether an employee was properly disqualified from receipt of unemployment compensation benefits under Minn.Stat. § 268.09, subd. 1(b) is a question of law upon which this court remains free to exercise its independent judgment. *Id.; Smith*

*v. Employers' Overload Co.*, 314 N.W.2d 220, 221 (Minn.1981).

■ The issue raised in this case is whether Nurse Ress committed misconduct within the meaning of Minn.Stat. § 268.09, subd. 1(b) by acting beyond the scope of his nursing license in initiating an unauthorized, dangerous procedure and by refusing to follow directions of a first-year resident physician. We believe that he did and thus reinstate the commissioner's order.

■ The issue in this action is not whether Abbott should have terminated Nurse Ress, but whether, now that he is unemployed, he should be denied unemployment compensation benefits as well. *See Windsperger v. Broadway Liquor Outlet*, 346 N.W.2d 142, 143 (Minn.1984). The declared policy of our state provides that benefits extend only to persons unemployed through no fault of their own. *Auger v. Gillette Co.*, 303 N.W.2d 255, 257 (Minn. 1981). Thus, under the Minnesota unemployment compensation laws, an individual discharged for "misconduct" "shall be disqualified for waiting week credit and benefits." This disqualification continues "until four calendar weeks have elapsed following the individual's separation and the individual has earned eight times the individual's weekly benefit amount in insured work." Minn.Stat. § 268.09, subd. 1(b) (1988).

The statute does not define "misconduct." This court has adopted the following widely accepted definition:

> [T]he term "misconduct" * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good per-

---

**3.** A preceptor teaches and evaluates new nurses.

formance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed "misconduct" * * *. *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973).

We have applied the *Tilseth* definition of "misconduct" in a number of cases to decide what conduct is bad enough to warrant losing unemployment compensation benefits as well as a job. This is primarily a fact-based inquiry. *See Auger v. Gillette Co.*, 303 N.W.2d 255, 257 (Minn.1981) (decision whether an employee disregarded employer's interest varies depending on the job). Generally, this court has considered one or more of the following factors: (1) whether an employee deliberately violated standards of behavior which the employer has a right to expect of its employee, (2) whether an employee's conduct adversely affected the business or other employee's morale, and (3) whether an employee ignored past warnings. *See id.*

Specifically, we have found "misconduct" where a nurse's aide mistreated a patient. *Ideker v. LaCrescent Nursing Center, Inc.*, 296 Minn. 240, 241, 207 N.W.2d 713, 714 (1973). In *Ideker*, a nurse's aid in a private nursing home displayed willful disregard of the employer's interests and a lack of concern for the job by twice using extremely hostile language in expressing her dissatisfaction with a bed-ridden male patient's incontinence. *Id.*

A single incident where an employee deliberately chooses a course of action adverse to the employer can constitute misconduct. *Colburn v. Pine Portage Madden Bros.*, 346 N.W.2d 159, 161 (Minn. 1984). Refusing to perform work within assigned duties can also constitute misconduct. *In re Heilman v. United Dressed Beef Co.*, 273 N.W.2d 628, 630 (Minn.1978); *Blom v. Madsen's Enter., Inc.*, 298 Minn. 573, 574, 215 N.W.2d 791, 791–92 (1974). Even refusing to run a personal errand for the employer in a small business can constitute misconduct where the employee's refusal adversely affects the company's operations. *McGowan v. Executive Express*

*Transp. Enter., Inc.*, 420 N.W.2d 592, 596 (Minn.1988). In *McGowan*, we emphasized that the employee deliberately refused to carry out a reasonable directive of the employer. *Id.*, at 595–96.

In misconduct cases, we also consider whether an employee's conduct leads to dissension among other employees. *Auger*, 303 N.W.2d 255, 257; *In re Heilman v. United Dressed Beef Company*, 273 N.W.2d 628, 630 (Minn.1978). For example, in *Auger*, two night janitors demonstrated a willful disregard of the employer's interest by sleeping on the job with blankets, pillows, cardboard beds and an alarm clock. In finding misconduct, the court noted that their conduct adversely affected the morale of other employees, leading to dissension. *Auger*, 303 N.W.2d at 257.

In *Heilman*, "boners" at a beef processing plant cut off, but did not trim the ninth rib on sections of meat as their employer required and still took full credit for the extra time entailed to trim the ninth ribs. *Heilman*, 273 N.W.2d at 629. The boners' conduct, although it involved only 4% of their work, showed an intentional and substantial disregard of the employer's interests. *Id.* at 629–30. In so holding, we noted that "their conduct could easily have led other employees to decide that they also need not perform all of the work assigned to them." *Id.* at 630.

Finally, this court often cites disregard of warnings as a reason for finding misconduct. For example, an employee who continued to antagonize other employees and spread rumors after warnings to refrain from this disrupting conduct committed "misconduct." *Booher v. Transport Clearings of Twin Cities, Inc.*, 260 N.W.2d 181, 183 (Minn.1977). Further, a custodian's constant complaints about nude portraits at the college's Fine Arts Building disrupted the art program and interfered with her work. Her persistent complaints, even after the employer offered to transfer her to another building and warned her to quit complaining or lose her job, warranted a finding of misconduct. *Feia v. St. Cloud*

*State College,* 309 Minn. 564, 565, 244 N.W.2d 635, 636 (1976).

Although a single incident can constitute misconduct, *Colburn,* 346 N.W.2d at 161, an isolated incident based on a misunderstanding can evince a good-faith error in judgment not adversely affecting the employer's interests. *Sticha v. McDonald's No. 291,* 346 N.W.2d 138, 140 (Minn.1984). In *Sticha,* this court found that inadvertently misleading an employer to believing that an employee was taking time off for a funeral rather than a wake was not misconduct. *Id.* Further, an isolated "hot-headed" incident that does not interfere with an employer's business is not misconduct justifying a denial of benefits. *Windsperger v. Broadway Liquor Outlet,* 346 N.W.2d 142, 145 (Minn.1984).[4]

Other conduct that does not constitute misconduct includes inadvertent incidents of negligence, *Swanson v. Columbia Transit Corp.,* 311 Minn. 538, 538, 248 N.W.2d 732, 733 (1976); *Abramson v. Yellow Taxi Company of Minneapolis,* 308 Minn. 453, 242 N.W.2d 77 (1976); and refusal to work because of a reasonable fear for safety. *Ferguson v. Department of Employment Serv.,* 311 Minn. 34, 45, 247 N.W.2d 895, 900–01 (1976).

As Abbott argues, the record does reasonably support the commissioner's findings of the following facts: Nurse Ress initiated an unauthorized, inappropriate and potentially dangerous mode of treatment that went beyond the scope of his nursing license.[5] Further, Nurse Ress refused to follow the recommendations and direct orders of a resident physician. We agree with the commissioner's conclusion of law: initiating an unauthorized treatment and disregarding the orders of a doc-

tor each establish misconduct because such conduct demonstrates a willful disregard for standards of behavior which an employer has a right to expect of its employee. Abbott had a right to expect Nurse Ress, an experienced nurse, to operate in emergency situations within the scope of his nursing license according to established procedures prepared to handle those situations. Breach of these necessary standards could expose the patient to serious harm and expose Abbott to malpractice claims: both legitimate interests of the employer. Further, as the commissioner emphasized, Nurse Ress's actions in flouting well-established standards could have caused dissension among the other employees at Abbott.

Nurse Ress defends his actions as good-faith errors in judgment, and the court of appeals agreed. We disagree. In our judgment, no reasonable person could have believed that he was acting in the best interests of the patient under these circumstances. Second, Nurse Ress did not act consistently with his training and past warnings. Third, he did not have good cause to disobey an order from a physician. Finally, he could not have honestly believed that his actions were authorized by established procedure. Moreover, if there is one unique area of employment law where strict compliance with protocol and militarylike discipline is required, it is in the medical field. Human lives depend on it, and those not trained as physicians cannot be given the encouragement to act as though they were so trained.

For all of these reasons, Nurse Ress acted in willful disregard for Abbott's interests in the health of its patients, its

---

**4.** We have described *Sticha* and *Windsperger* as reaching "into the outer limits of eligibility" for unemployment benefits. *McGowan,* 420 N.W.2d at 595. In *McGowan,* we declined "to liberalize further the granting of benefits contained in those two cases." *Id.*

**5.** Ress argues that the commissioner does not have the authority to determine that he acted beyond the scope of his license because that decision is reserved for the Minnesota Board of Nursing. The Board of Nursing does have the power to deny, suspend, revoke, or restrict nurs-

ing licenses pursuant to Minn.Stat. § 148.261 (1988). The commissioner does not purport, however, to take away Ress's license, but only seeks to "administer and supervise all forms of unemployment insurance" as authorized by Minn.Stat. § 268.0122, subd. 2(1) (1988). Therefore, the commissioner did not err as a matter of law by considering Ress's actions outside his nursing license to determine whether he committed "misconduct" within the meaning of the unemployment insurance laws.

reputation, and its exposure to a malpractice action. Nurse Ress must be disqualified from receiving benefits.

The commissioner's order is reinstated, and the decision of the Minnesota Court of Appeals is reversed.