**PEMISCOT COUNTY MEMORIAL HOSPITAL, a Missouri Corporation, Appellant–Petitioner,**

v.

**MISSOURI LABOR & INDUSTRIAL RELATIONS COMMISSION; Henry Panethiere, Chairman; Philip M. Barry, Member; Robert Thane Johnson, Member; and Charles Lewis, Respondents–Respondents.**

No. 19769.

Missouri Court of Appeals,
Southern District,
Division One.

May 4, 1995.

W. Edward Reeves, Ward & Reeves, Caruthersville, for appellant.

John B. Keller, II, for Labor and Industrial Relations Com'n.

Sandy Bowers, Jefferson City, for Division of Employment Sec.

FLANIGAN, Judge.

Charles Lewis filed a claim for unemployment benefits under the Missouri Employment Security Law [Ch. 288],[1] based upon services performed by him, for pay, for Pemiscot County Memorial Hospital. In protesting Lewis's claim, the hospital, as employer, stated: "Mr. Lewis was terminated due to working outside his job description. He circumvented the charge nurse and performed an invasive procedure even after she told him not to. He performed an invasive procedure without authorization. He was verbally condemning the family in their presence." The Labor and Industrial Relations Commission of Missouri determined that Lewis was discharged on September 28, 1992, "but not for misconduct connected with his work," and that Lewis "is not disqualified for benefits by reason of his discharge."

Pursuant to § 288.210, the hospital filed a petition for review in the Circuit Court of Dunklin County, the county of Lewis's residence. The court entered an order affirming the findings of the commission. The hospital appeals.

Appellant contends, in essence, that the record establishes, as a matter of law, that Lewis was "discharged for misconduct connected with his work," § 288.050.2, that the commission erred in ruling otherwise, and that the findings of the commission are not supported by competent and substantial evidence.

■ On this appeal, this court reviews the decision of the commission, and not the judgment of the circuit court. *Burns v. Labor & Indus. Relations Com'n,* 845 S.W.2d 553, 554[1] (Mo.banc 1993). The findings of the commission as to facts, if supported by competent and substantial evidence and in the absence of fraud, are conclusive. *Id.* at 554–555. This court reviews the evidence in a light most favorable to the findings and decision of the commission and must disregard all opposing and unfavorable evidence. *Id.* at 555[3]. This court is not bound by the commission's findings on questions of law. *Kansas City Club v. LIRC,* 840 S.W.2d 273, 275[2] (Mo.App.1992); *St. John's Reg. Medical Center v. LIRC,* 814 S.W.2d 698, 699[1] (Mo.App.1991).

Section 288.050 deals with disqualification for unemployment compensation benefits where the claimant has been discharged for misconduct connected with his work. The statute reads, in pertinent part:

1. Except where otherwise indicated, all references to statutes are to RSMo 1994, V.A.M.S.

"2. Notwithstanding the other provisions of this law, if a deputy[2] finds that a claimant has been discharged for misconduct connected with his work, such claimant, depending upon the seriousness of the misconduct as determined by the deputy according to the circumstances in each case, shall be disqualified for waiting week credit or benefits for not less than four nor more than sixteen weeks for which he claims benefits and is otherwise eligible. In addition to the disqualification for benefits under this provision the division may in the more aggravated cases of misconduct cancel all or any part of the individual's wage credits, which were established through his employment by the employer who discharged him, according to the seriousness of the misconduct."

In the following cases the commission found that the claimant had been discharged for misconduct connected with his work, and the appellate court affirmed that finding: *Stanton v. Mo. Div. of Employment Sec.*, 799 S.W.2d 202 (Mo.App.1990); *Hurlbut v. Labor & Indus. Rel. Com'n*, 761 S.W.2d 282 (Mo. App.1988); *Massey v. Labor & Indus. Relations Com'n*, 740 S.W.2d 680 (Mo.App.1987); *Morotz v. Labor & Indus. Rel. Com'n of Mo.*, 669 S.W.2d 60 (Mo.App.1984); *Powell v. Div. of Emp. Sec., Etc.*, 669 S.W.2d 47 (Mo.App. 1984); *Accord v. Labor and Indus. Relations Commission*, 607 S.W.2d 174 (Mo.App.1980); *Sain v. Labor and Ind. Relations Com'n*, 564 S.W.2d 59 (Mo.App.1978); *Ritch v. Industrial Commission*, 271 S.W.2d 791 (Mo.App. 1954). In the following case the commission found that the claimant had been discharged for misconduct connected with his work, and the appellate court reversed that finding: *Laswell v. Industrial Com'n of Missouri, Etc.*, 534 S.W.2d 613 (Mo.App.1976).

In the following cases the commission found no misconduct, and the appellate court affirmed that finding: *Garden View v. Labor & Indus. Rel. Com'n*, 848 S.W.2d 603 (Mo. App.1993); *Continental Research v. Labor & Indus. Rel.*, 708 S.W.2d 749 (Mo.App.1986);

*Von Hoffman Press, Inc. v. Industrial Commission*, 478 S.W.2d 403 (Mo.App.1972).

In *Garden View*, at 605–606 the court said:
"Misconduct as used in [§ 288.050.2] has been defined as:

[A]n act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of the standards of behavior which the employer has a right to expect of his (or her) employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's obligations to the employer."

In *Stanton*, quoting § 288.020, RSMo 1949, the court said, at 203: "The purpose of the unemployment compensation laws is 'to provide for the compulsory setting aside of an unemployment reserve to be used for the benefit of persons unemployed through no volition of their own.'"

█ Provisions for benefits for persons unemployed through no fault of their own require liberal construction, and disqualifying provisions of the law are to be strictly construed against the disallowance of benefits to unemployed but available workers. *Mo. Div. of Emp. Sec. v. Labor & Indus. Rel.*, 651 S.W.2d 145, 148 (Mo. banc 1983). "In short, judicial interpretations of the unemployment statutes have required that an employee not have *caused* his dismissal by his wrongful action or inaction or his choosing not to be employed." *Id.* at 149.

█ Although claimant Lewis had the burden to show that he is entitled to unemployment benefits, the hospital, as employer, had the burden of showing, by competent and substantial evidence, that Lewis was discharged for misconduct connected with work. *Garden View*, at 606[5].

█ The violation of a reasonable work rule can constitute misconduct. *Hurlbut*, at 285. Determination of whether certain con-

**2.** The Commission adopted the decision of the Appeals Tribunal as its decision. The Appeals Tribunal had reversed a determination of a deputy that Lewis was disqualified for unemployment benefits because he was discharged for misconduct connected with his work.

duct constitutes "misconduct connected with his work" is a "troublesome question," and there is more to the issue than a simple or deliberate violation of an employer's rule of conduct. *Powell*, at 50[8] (quoting *Laswell*, at 616). Poor workmanship, lack of judgment, or the inability to do the job do not disqualify a claimant from receiving benefits on the basis of misconduct. *Powell*, at 51[9]; *Sain*, at 62. Misconduct includes "a disregard of standards of behavior which the employer has the right to expect of his employee." *Acord*, at 176[3] (quoting *Laswell*, at 616). There is a "vast distinction" between the violation of a rule of an employer that would justify the discharge of the employee and a violation of such rule that would warrant a determination of misconduct connected with the employee's employment so as to disqualify him for unemployment compensation benefits. *Laswell*, at 617. See also *Von Hoffman Press, Inc.*, at 405.

 Although the commission must give "reasons" for its decision, § 288.200.1, the reasons need not be in any particular form. *Garden View*, at 607[11]. Where the commission has reached one of two possible conclusions from the evidence, the reviewing court may not reach the other conclusion, even if it might be reasonable. *Stanton*, at 203. Whether the commission's findings support the conclusion that the claimant is guilty of misconduct connected with his work, thereby disqualifying him from unemployment benefits, is a question of law, and this court is not bound by the commission's decision. *Powell*, at 50[5]; *Sain*, at 61[2].

An incident occurring on September 24, 1992, resulted in appellant's discharging Lewis on September 28, 1992. Lewis is an emergency medical technician, "EMT." Prior to the September 24 episode, Lewis and other EMTs had signed a hospital regulation which listed certain procedures which the EMTs were authorized to do and other procedures which EMTs were not authorized to perform "UNDER ANY CIRCUMSTANCES." Included in the latter category were: "any invasive procedures, including IV's," and "administer medication in any form to a patient."

The commission's findings of fact included the matters set forth in the following five paragraphs.

On September 24, 1992, a 13–year–old child was brought to the emergency room at the hospital. The child was mentally incapable of communicating. The child was in an uncontrollable state, with impacted bowels, and resisted the attempts of the hospital staff to restrain him. The child was eventually restrained on a bed by using sheets.

Lewis responded to a call for assistance in the emergency room. Lewis saw what he considered to be a "huge" fecal impaction on the child. The impaction extended six to seven centimeters outside of his body. Lewis felt the child was abused or neglected to be in that condition. Lewis made the statement, "You know this is abuse, you wouldn't treat a dog like this." The statement was made in the presence of the child's sister. Lewis did not specifically name any individual as an alleged abusing party. Lewis asked if a camera could be brought into the emergency room so that pictures could be taken of the child. Lewis did this because the child's sister did not appear to be interested in the child's welfare and because it was state law for hospitals to report any instances of apparent child abuse or neglect. Lewis indicated this was normally done by taking pictures.

Michelle Manley, a licensed practical nurse, was Lewis's immediate supervisor and the person in charge of the emergency room at the time of the incident. Manley instructed Lewis to remove the fecal impaction from the child. Manley told Lewis that she would be contacting a doctor.

Lewis removed the fecal impaction by using gloves, a jelly, and an over-the-counter type of medication. The procedure used by Lewis immediately alleviated the pain and suffering of the child.

On September 28, 1992, Lewis was discharged because he violated certain policies of the employer which provided that any invasive procedure cannot be performed without permission from a doctor and that medication cannot be provided by Lewis without permission from a doctor. Lewis used the medication to assist in removing the

fecal impaction "because this was part of the normal procedure for removing a fecal impaction that Lewis received in training." Lewis agreed that the procedure he followed in removing the fecal impaction was invasive.

The "conclusions of law" of the commission included the following: Lewis was discharged because he used an invasive procedure in removing a fecal impaction from a patient without permission or approval from a doctor, because he used a medication without permission from a doctor, and because he engaged in what the employer considered to be inappropriate behavior while making statements about child abuse or neglect, and requesting a camera. While the employer's policy does state the claimant cannot use an invasive procedure, such as a fecal removal, without permission or authority from a doctor, nor can he use medication for this purpose, the evidence indicates that Lewis received an instruction from his immediate supervisor [Manley] to remove the fecal impaction. Lewis had a right to rely on the instruction of his immediate supervisor for this purpose. Lewis used a medication because this was part of the training he received in the procedure for removing a fecal impaction. Under the circumstances, the act of Lewis in removing the fecal impaction from the child, and using a medication for this purpose, was not a willful or intentional disregard of the employer's interest, since he was following the instructions of his immediate supervisor. The statements made by Lewis with respect to alleged child abuse or neglect, and his requesting a camera, did not rise to the level of misconduct. It is therefore found that Lewis was discharged, on September 28, 1992, but not for misconduct connected with his work.

In general, the commission's findings of fact are supported by the record. The hospital's witnesses were Deborah Sanders, EMT; Michelle Manley, L.P.N.; Ella Franks, R.N.; and Gerald Adams, Director of Nursing. Lewis testified in his own behalf.

Sanders testified that she was working in the emergency room on September 24, 1992. Between the child's admission to the emergency room and the removal of the impaction, a period of 10 to 20 minutes, the situation was one of "agitation, confusion and screaming."

Manley testified that the child was wild and uncontrollable and "we had to chase him around the emergency room." She also testified that Lewis was shocked at the condition of the child. When Lewis put his gloves on, "one of the EMTs said, 'Wait, I think [Manley] is going to call a doctor.' I said, 'Wait a minute.' Lewis looked at me and I just threw my arms up and said 'go ahead.'" I had not called the doctor at the time I told Lewis to go ahead. Lewis knew I had not talked to the doctor. It took 10 or 15 minutes to get hold of the doctor. After the impaction was removed, the child was calm.

Franks testified that Lewis told her that he had removed the impaction. "This is an invasive procedure because you are going into a body orifice and we must have an order before we proceed. I was the day supervisor and I did not have the authority to direct Lewis to remove the impaction, not without a physician's order. Lewis used a medication to remove the impaction."

Adams testified that he fired Lewis. He told Lewis that he sympathized with the situation but the action was not right. "He did an invasive procedure without a doctor's order. It's a violation of hospital regulations if Lewis had the permission of Nurse Manley. Manley had been a nurse only a short time and was inexperienced. Lewis had been in health care for eight years."

Lewis testified that Nurse Manley was his immediate superior and that she had not contacted a physician. He said the child was in severe pain, and it was obvious that the source of distress was the fecal impaction which he removed. "I performed the procedure, which is an invasive procedure. I am aware of the statement on the [hospital regulations] that EMTs are not to perform certain procedures."

 In arguing that Lewis's actions constituted "misconduct connected with his work," appellant cites *Davis v. California Unemployment Insurance App. Bd.,* 43 Cal. App.3d 71, 117 Cal.Rptr. 463 (1974), *Ress v. Abbott Northwestern Hosp., Inc.,* 448 N.W.2d 519 (Minn.1989), and *Myers v. Com., Unemp.*

*Comp. Bd. of Review,* 88 Pa.Cmwlth.Ct. 399, 490 A.2d 18 (1985). Appellant says: "[Those three cases] are more on point than published Missouri opinions. All stand for the proposition that the employee of a health-care provider is not free to disregard the policies, regulations, and procedures established by his employer to act in what is in his own judgment the best interest of the patient."

Generally speaking, this court agrees with that proposition. This court also agrees with the Minnesota Supreme Court when it said, in *Ress,* at 525:

"Moreover, if there is one unique area of employment law where strict compliance with protocol and militarylike discipline is required, it is in the medical field. Human lives depend on it, and those not trained as physicians cannot be given the encouragement to act as though they were so trained."

In each of those cases, the state commission had denied the employee's claim for unemployment compensation benefits, and the reviewing court affirmed the denial. As may be expected, the facts in them differ from the instant facts.

In *Davis,* the claimant, a nurse, violated hospital policy by changing the prescribed amount of medication she administered to a patient without the permission of the prescribing physician. The claimant had a habit of not giving proper dosages of medication because she did not believe a patient should receive what in her opinion was excessive medication. There had been prior complaints from patients that claimant did not give them the proper medication and claimant had lectured them concerning taking medication. The court also said that a determination that claimant was entitled to benefits would have been supported by substantial evidence.

In *Ress,* the claimant, a registered nurse, was asked by the attending physician to move a tube to relieve the patient. The claimant refused, commenting on how difficult it was to place the tube in the patient. The physician testified that several actions by the claimant were dangerous and may have contributed to the speed at which the patient died. The claimant also refused to obey the order of the attending physician to obtain a chest x-ray of the patient. The court said that the hospital had the right to expect the claimant to operate in emergency situations within the scope of his nursing license according to established procedures prepared to handle those situations. The court also said that breach of those necessary standards could expose the patient to serious harm and the hospital to malpractice claims, both of which were legitimate interests of the employer. The court also said, at 525: "In our judgment, no reasonable person could have believed that he was acting in the best interests of the patient under these circumstances."

In *Myers,* the claimant, a nurse, administered medication to a patient without checking the medical chart. As a result, the patient received a double dosage. The claimant also failed to enter on the chart the fact that she had administered the medication. On appeal from a denial of her claim, the claimant argued that her violations were inadvertent and did not constitute willful misconduct. Rejecting that argument, the court said that it refused to extend the "inadvertence exception" to rule violations by health care professionals. The court also said that performing prescribed treatment and correctly marking charts are vital components of obligations to the employer and to the patients and that a failure to perform those functions is a sufficiently serious offense to constitute willful misconduct.

This court does not disagree with the general principles enunciated in the three out-of-state cases. This court does not disagree with findings of misconduct based upon those factual situations. For the reasons which follow, however, this court agrees with the ruling of the commission that Lewis's conduct, under the peculiar circumstances, did not constitute "misconduct connected with his work."

Unlike *Davis,* this is not a case where a nurse changed dosage and substituted her opinion for that of the attending physician. Unlike *Ress,* this is not a case where a nurse defied the order of a physician who was present. Unlike *Myers,* this is not a case

where a nurse acted adversely to the interest of the patient by failing to monitor the patient's chart.

There are some inconsistencies in the hospital's position. In its protest, the hospital said that Lewis circumvented the charge nurse [Manley] and performed an invasive procedure after she told him not to do so. The record supports the finding of the commission that Manley instructed Lewis to remove the fecal impaction. The regulations prohibited an EMT from performing any invasive procedure and from administering medication in any form to a patient "under any circumstances." The evidence was, as the hospital's excellent brief says, "these procedures can only be undertaken by an EMT with the permission of a physician."

The burden of proof was on the hospital to show, in this situation, a *deliberate* violation of the employer's rules. It is true that an emergency room, by its very nature, is often the scene of dramatic and traumatic events. No doctor was present in the emergency room. Witness Sanders testified she didn't know if one was in the building. Sanders also stated that the child, obviously in acute distress, was digging at himself.

Although Lewis made some remarks which, arguably, should not have been made, Manley testified that Lewis spoke "in an average tone." Manley also stated that it took 10 to 15 minutes to reach a doctor after the impaction had been removed. Manley was not fired by the hospital, but only reprimanded. Hospital's witness Adams testified that he offered to let Lewis resign, rather than be fired.

The commission found, as earlier stated, that Lewis's removal of the impaction "was not a willful or intentional disregard of the employer's interest, since he was following the instructions of his immediate supervisor." The commission found that Lewis was discharged, "but not for misconduct connected with his work," and that Lewis "is not disqualified for benefits by reason of his discharge." Under the peculiar circumstances, and in light of the entire record, this court holds that these findings are supported by competent and substantial evidence.

The judgment is affirmed.

SHRUM, C.J., and MONTGOMERY, J., concur.