*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A25-0544

Tamer K. Embaby,
Relator,

vs.

Department of Treasury,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed January 26, 2026**
**Affirmed**
**Kirk, Judge**[*]

Department of Employment and Economic Development
File No. 50743407-3

Tamer K. Embaby, Minneapolis, Minnesota (self-represented relator)

Department of Treasury, St. Louis, Missouri (respondent employer)

Keri A. Phillips, Melannie M. Markham, Katrina Gulstad, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Frisch, Chief Judge; Cochran, Judge; and Kirk, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**KIRK**, Judge

Relator challenges the decision of the unemployment-law judge (ULJ) determining that because relator was discharged for employee misconduct, he is ineligible for unemployment benefits. We affirm.

## FACTS

Self-represented relator Tamer K. Embaby began working in Minnesota for respondent-employer the Department of Treasury (IRS) in January 2024 and was terminated four months later. Embaby then applied for and was deemed eligible to receive unemployment insurance after respondent Department of Employment and Economic Development entered a determination that Embaby was discharged for "unsatisfactory work performance" and his "actions were not employment misconduct." The IRS appealed the determination, stating their records indicated that Embaby was removed for misconduct, not for performance. A ULJ conducted evidentiary hearings between late August and mid-October 2024. Embaby's former direct supervisor located in Ohio (supervisor) and his program manager in Missouri (manager) appeared on the IRS's behalf. Embaby appeared pro se and testified.

Evidence before the ULJ included Embaby's termination letter, which stated he was discharged because of his "Failure to Follow Instructions or Directions, Failure to Follow Established [P]rocedures, and Unprofessional Conduct." The letter described his behavior as "unacceptable and unbecoming of an IRS employee" due to his "condescending, disrespectful, and dismissive" conduct, and his "inability to interact appropriately with co-

workers." The letter outlined the following incidents as leading to his termination: Embaby's "pushback" responses to management when asked to complete various tasks, his communication with co-workers, and his interaction with a cleaning staff member and building management.

Regarding the incident with cleaning staff and building management, testimony revealed that within the first few weeks of his employment, Embaby confronted a member of the cleaning staff about vacuuming an unoccupied cubicle into which he was moving. Manager testified that a co-worker who witnessed the interaction later filed a complaint alleging Embaby "bully[ed] and harass[ed]" the cleaning staff. Later that day, Embaby discussed the incident with his on-site manager and emailed supervisor stating the cleaning staff member was, "a Hispanic woman," who he claimed had "a sort of anxiety or maybe a mental or physical issues." The termination letter described Embaby's comments as "impl[ying] her nationality or mental status may be affecting her ability to work efficiently."

Following the incident, supervisor testified that she instructed Embaby to contact her should any ongoing issues with the cleaning staff arise. During her testimony, supervisor acknowledged that, considering she was in Ohio, she had also mentioned to Embaby that he could contact the on-site manager if there was an immediate issue, but this was "not [to] dismiss the communication that [Embaby] should continue to have with [her]." Both supervisor and manager testified that they reiterated this direction in a meeting with Embaby.

Despite these instructions and without supervisor's knowledge, testimony established that Embaby went to the building management office three times concerning issues about the cleaning staff and setting up a cleaning schedule for his cubicle. Then at the beginning of May, manager issued a "Managerial Directive to Cease Unauthorized Contacts" to Embaby. The directive stated Embaby was "not given authorization to represent the IRS regarding cleaning issues" with the cleaning company or the building management team. It explicitly directed Embaby to contact his manager if he had any further concerns with the cleaning staff or building management.

Regarding Embaby's "pushback," supervisor described incidents in which Embaby was provided "simple" requests to complete training, provide contact information, complete elevator access forms, and make corrections. Supervisor testified these "simple" instructions were constantly met with resistance or required multiple requests before completion. Supervisor and manager summarized his demeanor and communication during these incidents as "not very professional" and "not very respectful and [] very demeaning to the individuals [with whom] he is communicating." They testified how his interaction with other staff was "a little aggressive" and how other staff felt "uncomfortable" interacting with him. Supervisor described, "it's really not to his performance. It's really to his conduct and how he works through issues that's concerning." Manager clarified that "it wasn't just the cleaning reason that he was terminated . . . it was just a combination of a lot of things, just never following direction, pushing back, being competitive, unprofessional . . . it was everything . . . just nothing simple."

4

On October 23, 2024, the ULJ issued their findings of fact and decision, concluding Embaby was ineligible for benefits because he was discharged for employee misconduct. The ULJ made detailed credibility findings, explaining as to any disputed facts, they credited the employer's witnesses' testimony over Embaby's because "it described the more likely series of the events and because it was more direct and straightforward." The ULJ explained Embaby's testimony as "not direct, straightforward, or probable." The ULJ determined that Embaby was discharged for employee misconduct because of his failure to inform supervisor about ongoing issues with the cleaning staff, and his constant "pushback" when given directives.

Following the decision, Embaby requested reconsideration and a new ULJ, claiming the ULJ erred in evidentiary and credibility determinations. His request for a new ULJ was denied by the Chief ULJ. The ULJ then issued an order affirming their original decision as "factually and legally correct." The ULJ reasoned, "[t]he central finding of the decision was that [supervisor] gave Embaby clear directives, and he chose not to follow them. This was sufficient to constitute employment misconduct." The ULJ further concluded that Embaby had not provided any information or arguments that would have affected the outcome of the decision requiring amendment to the decision or another hearing.

Embaby petitioned for a writ of certiorari.

**DECISION**

When reviewing the decision of a ULJ, we may affirm, remand for further proceedings, or modify the decision if the substantial rights of the petitioner may have been prejudiced because the ULJ's

> findings, inferences, conclusions, or decisions are: (1) in violation of constitutional provisions; (2) in excess of the statutory authority or jurisdiction of the department; (3) made upon unlawful procedure; (4) affected by other error of law; (5) unsupported by substantial evidence in view of the hearing record as submitted; or (6) arbitrary or capricious.

Minn. Stat. § 268.105, subd. 7(d) (2024). Broadly, Embaby argues that (1) the ULJ's decision is unsupported by substantial evidence; (2) the ULJ erred in their credibility determination; (3) the procedure was unlawful because of evidentiary and procedural decisions made by the ULJ; and (4) the ULJ misapplied the law on the burden of proof. We address each argument in turn.

**I.**

Embaby first argues that the ULJ's determination that he was terminated due to misconduct was not supported by substantial evidence in the record. Instead, he argues that his discharge was a pretext for discrimination based on fabricated allegations. We are not persuaded.

***Employee Misconduct***

"Substantial evidence is (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its

6

entirety." *Dourney v. CMAK Corp.*, 796 N.W.2d 537, 539 (Minn. App. 2011) (quotation omitted).

Unemployment benefits are intended to provide financial assistance to persons who have been discharged from employment "through no fault of their own." *Stagg v. Vintage Place Inc.*, 796 N.W.2d 312, 315 (Minn. 2011) (quotation omitted). A person who has been discharged from employment because of "employment misconduct" is ineligible for unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2024); *see also Wichmann v. Travalia & U.S. Directives, Inc.*, 729 N.W.2d 23, 27 (Minn. App. 2007). Whether an employee engaged in misconduct is a mixed question of law and fact. *Stagg*, 796 N.W.2d at 315. "We view the ULJ's factual findings in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ." *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006) (citations omitted). "In doing so, we will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Id.* (citing Minn. Stat. § 268.105, subd. 7(d) (Supp. 2005)). But we review de novo whether an employee's act "constitutes disqualifying misconduct." *Stagg*, 796 N.W.2d at 315.

"Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job, that is a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." Minn. Stat. § 268.095, subd. 6(a) (2024). "An employer has a right to expect that its employees will abide by reasonable instructions and directions." *Vargas v. Nw. Area Found.*, 673 N.W.2d 200, 206 (Minn. App. 2004), *rev. denied* (Minn. Mar. 30, 2004). "As a general rule, refusing to abide by an

7

employer's reasonable policies and requests amounts to disqualifying misconduct." *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002). An employee's knowing violation of an employer's directives constitutes employment misconduct because such actions evince willful disregard of the employer's interests. *Id.* at 806. "This is particularly true when there are multiple violations of the same rule involving warnings or progressive discipline." *Id.* at 806-07. Whether the employee committed a particular act is a question of fact. *Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 855 (Minn. App. 2014), *rev. denied* (Minn. July 15, 2014).

Here, the ULJ determined that the evidence showed Embaby was discharged due to employment misconduct, specifically his failure to inform supervisor about ongoing issues with the cleaning staff and multiple occasions where Embaby "pushed back" in response to directives given by supervisor.

Beginning with whether Embaby's failure to inform supervisor about ongoing issues with the cleaning staff constituted employee misconduct, the ULJ made the following findings. The employer's directive to Embaby to communicate with supervisor if he had ongoing issues with the cleaning staff was reasonable because "of the employer's interest in ensuring the professionalism of its staff." The ULJ further reasoned that, due to Embaby's failure to follow the direction, the issue with the cleaning staff "spun out of control" because of supervisor's inability to address the situation. On appeal, Embaby argues his actions were reasonable because the instruction was ambiguous, and he interpreted it as supervisor delegating the primary point of communication to the on-site manager. Even still, the record shows that Embaby contacted the cleaning supervisor and

8

building management instead of supervisor—action adverse to his employer's direction. And, as the ULJ specifically noted, this behavior "alone, was sufficiently serious to rise to the level of employee misconduct." *See Ress v. Abbott Nw. Hosp., Inc.*, 448 N.W.2d 519, 524 (Minn. 1989) ("A single incident where an employee deliberately chooses a course of action adverse to the employer can constitute misconduct" (quoting *Colburn v. Pine Portage Madden Bros.*, 346 N.W.2d 159, 161 (Minn.1984))).

Moving to the occasions when Embaby "pushed back" in response to directives given by his employer, the ULJ found his behavior was "indifferent and insubordinate and seriously violated the employer's reasonable expectations." This finding is amply supported by the record. Both supervisor and manager testified to "constant pushback" and "negative and aggressive and emotional" responses they received from Embaby when they asked him to complete simple tasks such as mandatory briefings at training, paperwork regarding an elevator key, making a correction to a case file, or responding to a "call tree email." Supervisor even described an interaction Embaby had with an administrative worker for entering leave and calendar requests as making "them feel uncomfortable" because he was "a little aggressive." Supervisor described Embaby's behavior as "consistent . . . insubordination, not following direction, [and] pushback." Embaby's failure to abide by these reasonable, "simple" requests that did not impose an unreasonable burden on him, can constitute misconduct. *Vargas*, 673 N.W.2d at 206.

Accordingly, we conclude that the ULJ's determination that Embaby engaged in employee misconduct was supported by substantial evidence in the record.

9

***Pretext for Discrimination***

Embaby argues that, rather than employee misconduct, he was discharged as a "pretext for discrimination." In Minnesota, employers are prohibited from discharging an employee because they are a member of a protected class. Minn. Stat. § 363A.08, subd. 2 (2024). Protected classes include race, color, creed, religion, national origin, sex, gender identity, marital status, status with regard to public assistance, familial status, membership or activity in a local commission, disability, sexual orientation, or age. *Id.*

Discrimination plaintiffs may prove discriminatory intent by direct evidence or by using circumstantial evidence in accordance with the three-part *McDonnell Douglas* burden-shifting framework. *Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that test, before shifting the burden, the plaintiff must first make out a prima facie case of discrimination. *Id.* In the discriminatory discharge setting, the plaintiff must show that he: "(1) is a member of a protected class; (2) was qualified for the position from which [he] was discharged; and (3) was replaced by a non-member of the protected class." *Id.* (citation omitted).

Here, Embaby's allegation of discrimination fails at the first prong. He alleges that his discharge was a pretext for discrimination because he was treated less favorably than other employees, it was retaliation for filing a complaint against supervisor, and inconsistencies in the testimonies indicate the reasons for his discharge were unfounded. But none of these specify the protected class on which the alleged discrimination is based.

Accordingly, Embaby has not met his burden of establishing the requirements of a prima facie case for discrimination.

## II.

Embaby next challenges the ULJ's credibility determinations, arguing the ULJ did not provide sufficient reasons for its determination and that its determination was not supported by the record. We disagree.

Under Minn. Stat. § 268.105, subd. 1a(a) (2024), "[w]hen the credibility of a witness testifying in a hearing has a significant effect on the outcome of a decision, the [ULJ] must set out the reason for crediting or discrediting that testimony." This court has consistently held, "[c]redibility determinations are the exclusive province of the ULJ and will not be disturbed on appeal." *Bangtson v. Allina Med. Grp.*, 766 N.W.2d 328, 332 (Minn. App. 2009) (quotation omitted).

Here, as the decision-makers on Embaby's termination, supervisor's and manager's testimonies had a significant impact on the outcome. Accordingly, the ULJ made the statutorily required findings, dedicating almost a page to the credibility determination and explaining the reasons they credited supervisor and manager's testimonies over Embaby's. Embaby contends the ULJ's reasons were inadequate because they overlooked inconsistencies in supervisor's and manager's testimonies and neglected aspects of his. But "[w]hen the parties have presented conflicting evidence on the record, [we] must defer to the [ULJ's] ability to weigh the evidence; we may not weigh that evidence on review." *Whitehead v. Moonlight Nursing Care, Inc.*, 529 N.W.2d 350, 352 (Minn. App. 1995).

11

Embaby also argues the ULJ's credibility determination was unsupported by the record. We are not convinced. The ULJ supported their finding by highlighting how Embaby contradicted himself during his own testimony, specifically as it related to his knowledge of the directive to communicate directly with supervisor concerning issues with the cleaning staff. The ULJ also noted how Embaby's demeanor during the hearings, such as calling supervisor a liar, "supports the employer's contention that Embaby was combative and disrespectful towards [supervisor] during his employment." These are all proper reasons for determining the credibility of a witness. *See Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 533 (Minn. App. 2007). (providing that a ULJ may consider how a witness "learned the facts" and "the manner in which [they] described them" when evaluating witness credibility).

Accordingly, because of these reasons, we defer to the ULJ's credibility determinations and decline to disturb them on appeal.

### III.

Third, Embaby argues the procedure was unlawful because of evidentiary and procedural decisions made by the ULJ. We disagree.

#### *Hearsay Evidence*

Embaby contends that he did not receive a fair hearing because the ULJ admitted hearsay. We review a ULJ's evidentiary rulings for an abuse of discretion. *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 566 (Minn. App. 2001), *rev. denied* (Minn. Nov. 13, 2001). Under Minn. R. 3310.2922 (2023), a ULJ "may receive any evidence that possesses probative value, *including hearsay*, if it is the type of evidence

12

on which reasonable, prudent persons are accustomed to rely in the conduct of their serious affairs." (emphasis added). Further, a ULJ "is not bound by statutory and common law rules of evidence." *Id.*

Embaby specifically questions the ULJ's decision to allow testimony of a conversation with a cleaning staff supervisor and emails received by manager. Embaby correctly observes that at the hearing manager testified to events and conversations, although he had not been present when the incidents occurred. But "[a] witness at an evidentiary hearing is not required to have firsthand knowledge because a ULJ 'may receive any evidence which possess[es] probative value, including hearsay.'" *Skarhus*, 721 N.W.2d at 345 (quoting Minn. R. 3310.2922 (2005)).[1] Thus, the ULJ did not abuse their discretion in admitting the hearsay evidence.

### *Procedural fairness*

Embaby next argues that the procedure was unlawful because the ULJ failed to develop the record and that he was prejudiced when the ULJ altered the order of testimony.

---

[1] In his argument, Embaby relies on a United States Supreme Court case and a nonprecedential case from this court. First, in *Consol. Edison Co. of New York v. N.L.R.B.*, the Supreme Court acknowledged the flexible evidentiary standard in administrative proceedings but stated that the evidence must still have rational probative force. 305 U.S. 197, 217 (1938). Here, Embaby fails to show that the hearsay evidence does not have rational probative force—each was related to his conduct as an employee and was relied on in the decision to terminate his employment. Next, in *Eystad v. RKT Food and Fun LLC*, after noting there was no statutorily required credibility explanation by the ULJ, this court held a ULJ's decision was not supported by substantial evidence. No. A12-1511, 2013 WL 1188017, *3-4 (Minn. App. Mar. 25, 2013). But here, the ULJ provided a credibility determination with detailed rationale after weighing all the evidence. Therefore, neither of these cases advance Embaby's claims.

Under Minn. R. 3310.2921 (2023), a ULJ "must assist all parties in the presentation of evidence" and "ensure that all relevant facts are clearly and fully developed." We review legal questions de novo. *Thao v. Command Ctr., Inc.*, 824 N.W.2d 1, 4 (Minn. App. 2012).

Embaby challenges the ULJ's denial of his request to subpoena certain witnesses and documents. In doing so, Embaby accuses the ULJ of "already ma[king] up [their] mind, regardless of the evidence presented" and "undermining the impartiality of the proceeding." We are not persuaded. Under Minn. R. 3310.2914, subp. 1 (2023), the ULJ "may issue subpoenas to compel the attendance of witnesses, the production of documents or other exhibits, upon a showing of necessity by the requesting party." But a request "may be denied if the testimony or documents sought would be irrelevant, immaterial, or unduly cumulative or repetitious." *Id.* Here, during the hearings, the ULJ stated they wanted to take testimony from both parties before ruling on subpoena requests. Then on the last day, after hours of testimony, the ULJ ruled, "I think I have enough information to make my decision without issuing the subpoenas . . . I've already taken hours and hours of testimony." On reconsideration, the ULJ affirmed they had adequate information, reasoning that nothing in the subpoena requests changes the outcome of the case or shows that the employer provided false evidence during the hearing that would influence the outcome of the decision. In other words, the ULJ found the requested testimony and documents was "irrelevant, immaterial, or unduly cumulative or repetitious." This finding is properly within the discretion of the ULJ.

Embaby also argues that, because of his self-represented status, the ULJ was required to help him "recognize and interpret the parties' claims."

14

*Ntamere v. Decisionone Corp.*, 673 N.W.2d 179, 180 (Minn. App. 2003) (quotation omitted). But unlike *Ntamere*, in which the ULJ failed to enforce a subpoena and did not provide a legally sufficient reason, here, the ULJ denied the subpoena requests based on a legally sufficient and permitted reason—the requests being cumulative and unnecessary to enable the ULJ to make their decision.[2]

ULJs "have a duty to reasonably assist pro se parties with the presentation of evidence and the proper development of the record," *White v. Univ. of Minn. Physicians Corp.*, 875 N.W.2d 351, 355-56 (Minn. App. 2016) (quotation omitted). Here, the record shows just that: the ULJ explained process, clarified questions Embaby was trying to ask, assisted in asking the questions, discussed how evidentiary rules are different, explained the purpose of the closing statement, and even reminded Embaby he was required to introduce new information before closing. Thus, Embaby's allegation that the ULJ failed to assist in the presentation of evidence is unconvincing.

Embaby also argues the ULJ's decision to alter the order of testimony, without notice, influenced his ability to prepare. Under Minn. R. 3310.2921, "[t]he order of presentation of evidence is determined by the [ULJ]." Here, the ULJ's stated purpose for changing the order of testimony so that Embaby would testify earlier was because they "ha[d not] heard from [Embaby] at all yet," and "sometimes it's easier to communicate to

---

[2] On appeal, Embaby alleges his due-process rights were violated, but only makes conclusory arguments without any supporting legal authority. An assignment of error based on "mere assertion" without argument or supporting authority is waived. *Schoepke v. Alexander Smith & Sons Carpet Co.*, 187 N.W.2d 133, 135 (Minn. 1971).

the judge just by making statements and giving testimony as opposed to asking questions of the other party." Although Embaby states the ULJ's decision was in response to a suggestion from manager, it is unclear how it prejudiced Embaby. Therefore, Embaby's argument that the change in the order of testimony lead to an unlawful procedure, prejudicing him, is not compelling.

Accordingly, we conclude the procedure was lawful.

**IV.**

Finally, Embaby argues the ULJ misapplied the law regarding the burden of proof. Embaby alleges his former employer had the burden and failed to provide evidence to substantiate their claims. We are not persuaded.

"An applicant's entitlement to unemployment benefits must be determined based upon that information available without regard to a burden of proof." Minn. Stat. § 268.069, subd. 2 (2024); *see also Vargas*, 673 N.W.2d at 205 ("Employment misconduct is now determined without regard to any common law burden of proof."). "All issues under the Minnesota Unemployment Insurance Law are determined by a preponderance of the evidence standard." Minn. Stat. § 268.031, subd. 1 (2024). "The applicable standard of proof is a legal question [that this court] review[s] de novo." *Vermillion State Bank v. Tennis Sanitation, LLC*, 969 N.W.2d 610, 626 (Minn. 2022).

At the August 2024 hearing, the ULJ correctly stated that "this case will be determined by a preponderance of the facts," explaining the standard as "evidence in support of a fact that is more convincing and has a greater probability of truth than the evidence opposing the fact." Minn. Stat. § 268.035, subd. 21b (2024) (defining

16

preponderance of the evidence). The ULJ then stated that "entitlement to unemployment benefits must be determined based upon the information available without regard to burden of proof," and explained, "I will apply the law to the facts and will issue a written decision." The applicable standard is the preponderance-of-the-evidence standard, without regard to whether a party met a burden of proof, based on the ULJ's "independent findings of fact." *See Vargas*, 673 N.W.2d at 205. Therefore, the ULJ applied the proper burden of proof.

**Affirmed.**