**KENNETT BOARD OF PUBLIC WORKS, Employer–Appellant,**

v.

**Donald SHIPMAN, Claimant–Respondent,**

**Division of Employment Security, Respondent.**

No. 23126.

Missouri Court of Appeals,
Southern District,
Division One.

April 28, 2000.

Terry M. McVey, Kennett, attorney for appellant.

W. Edward Reeves, Caruthersville, attorney for respondent Donald Shipman.

Marilyn Green and Cynthia Quetsch, Jefferson City, attorneys for Missouri Division of Employment Security.

KENNETH W. SHRUM, Judge.

The Kennett Board of Public Works ("Employer") appeals a decision of the Missouri Labor and Industrial Relations Commission ("Commission") that affirmed an award of unemployment benefits to Donald Shipman ("Shipman"). Employer contends that it dismissed Shipman for "misconduct connected with his work" and that, as a result, he is ineligible for benefits. We affirm.

## FACTS

At the time of his dismissal, Shipman had been employed by Employer twenty-six years and eight months. The last "[f]our years and some few months" of his tenure with Employer, Shipman had been a "power plant supervisor." In this capac-

ity, Shipman supervised several employees.

During his term as power plant supervisor, Shipman also carried on a private farming operation. On occasion, Shipman would recruit power plant employees to perform jobs related to his farming operation during their regular working hours at the power plant. The evidence showed that Shipman made different arrangements with his employees that enabled them to maintain their hours at the power plant while working for him in his farming operation. Shipman testified that the employees would maintain their hours at the power plant by using their vacation time or their "comp time," or Shipman would "g[i]ve them" his "comp time or vacation." He explained that "[w]hen I gave them comp time I just took the comp time ... off of mine." Shipman testified that he and his employees accumulated "comp time" "[b]y working for someone else or working overtime and not taking pay for it." Until a few months before his dismissal, Shipman was solely responsible for tracking his and his subordinates' comp time and their time sheets did not distinguish between time actually worked and comp time. In addition to "giving" employees his comp time and vacation time, Shipman paid the employees for their services.

Regarding the origins of Employer's comp time system, Shipman testified, "It's like—been that way since I've been there." When asked if he knew "where [the comp time system] came from," Shipman responded, "People before me. It's just been ongoing and carried down through the years which was—every—everybody was aware of it." When asked about his practice of "giving" his comp time to other employees, Shipman responded, "We—we been doing it for, you know, one another for a long time.... Done it before I became supervisor." Later, he stated, "[L]ike I say, it's been ongoing for years so I didn't think there was any problems."

Another witness, Joey Hamlett, corroborated this portion of Shipman's testimony:

"Q [By Shipman to Hamlett] [H]ave you ever worked on [other employees'] stuff when they gave you their time, like their vacation or -

"A Until we got the time clock we used to do it a lot.

. . . .

"Q [By Employer's counsel to Hamlett] Joey, on the times that [Shipman] asked you about working for other City employees and taking comp time and everything was that while [Shipman] was your supervisor?

"A Yes, I believe it was.

"Q And so he—he knew about that and—and he was the one that kept the comp time and the—and the -

"A No, we even done that before [Shipman] was boss.

"Q Okay.

"A When—when Frank [Campbell]—when Frank was boss we done it. I mean it never changed, you know."

Employer and Shipman also adduced evidence of an incident in 1995 in which Shipman and some of his employees worked on his personal truck toolbox at the power plant shop. The evidence showed that—except for a five- or six-month period ten or twelve years before the hearing in this case—it had long been Employer's policy to allow employees to use the power plant's shop to work on personal projects, subject to certain limitations. The limitations were that any such work was to be performed "after hours" and the shop was to be used only by employees—not family members or friends. While the evidence indicated that some of the work on Shipman's toolbox may have been performed during regular business hours, there was also evidence that any such work may have been performed during regular breaks. Shipman also testified that the toolbox was going to be used for business purposes on a trip he was taking to Texas two days later.

Employer dismissed Shipman on October 8, 1998. Thereafter, Shipman filed a claim for unemployment benefits, and Employer protested the claim on the basis that it had dismissed Shipman for "misconduct in connection with his work" and that Shipman was, as a result, disqualified from receiving unemployment benefits. After an initial determination by a deputy for the Missouri Department of Labor and Industrial Relations, Division of Employment Security ("Division"), that Shipman was not disqualified from receiving benefits, Employer appealed the determination to the Division's Appeals Tribunal. The Appeals Tribunal, in turn, affirmed the deputy's determination that Shipman was not disqualified from receiving benefits. Employer then appealed the Appeals Tribunal's decision to the Commission. The Commission affirmed the determination of the Appeals Tribunal and adopted the tribunal's decision as its own. This appeal followed.

## DISCUSSION AND DECISION

█ Appellate review of a decision by the Commission is governed by § 288.210, RSMo Supp.1995. Under that statute, "[t]he findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law." Thus, our review is limited to questions of law unless the Commission's findings of fact are not supported by competent and substantial evidence or were obtained by fraud. *VanDrie v. Performance Contracting*, 992 S.W.2d 369, 372[1] (Mo.App.1999). Moreover, we " 'review[ ] the evidence in a light most favorable to the findings and decision of the Commission and disregard[ ] all opposing and unfavorable evidence.' " *Brown v. Div. of Employment Sec.*, 973 S.W.2d 199, 201[7] (Mo.App.1998) (quoting *England v. Regan Mktg., Inc.*, 939 S.W.2d 62, 66 (Mo.App.1997)). We are not bound by the Commission's conclusions of law or its application of law to the facts. *City of Kansas City v. Arthur*, 998 S.W.2d 870, 873[2] (Mo.App.1999).

█ Section 288.020.2, RSMo 1994, provides that the Missouri Employment Security Law, Chapter 288, RSMo, "shall be liberally construed to accomplish its purpose to promote employment security ... by providing for the payment of compensation to individuals in respect to their unemployment." "In keeping with this policy, disqualifying provisions in the law are strictly construed against the disallowance of benefits." *Arthur*, 998 S.W.2d at 873[5].

█ In its only point relied on, Employer claims the Commission erred in concluding that Shipman had not been dismissed for "misconduct connected with his work" as contemplated in § 288.050.2, RSMo Cum.Supp.1997. In pertinent part, § 288.050.2 provides:

"Notwithstanding the other provisions of this law, if a deputy finds that a claimant has been discharged for misconduct connected with the claimant's work, such claimant, depending upon the seriousness of the misconduct as determined by the deputy according to the circumstances in each case, shall be disqualified for ... benefits for not less than four nor more than sixteen weeks for which the claimant claims benefits and is otherwise eligible."

"Whether an employee's actions constitute misconduct associated with his work is a question of law. As such, we are not bound by the Commission's determination on this issue." *Arthur*, 998 S.W.2d at 873[4] (citations omitted).

█ Although a claimant has the burden of showing he or she is entitled to unemployment benefits, "when the employer claims that the applicant was discharged for misconduct, the burden shifts to the employer to prove the claim of misconduct connected with work." *Miller v. Kansas City Station Corp.*, 996 S.W.2d 120, 124[6] (Mo.App.1999); *City of Jennings v. Div. of Employment Sec.*, 943 S.W.2d 330, 334

(Mo.App.1997). The Missouri Employment Security Law does not define the term "misconduct" as it relates to § 288.050.2, but our courts have consistently defined the term as follows:

> " '[A]n act of wanton or wilful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.' "

*Arthur*, 998 S.W.2d at 873 (quoting *Sain v. Labor & Indus. Relations Comm'n,* 564 S.W.2d 59, 62 (Mo.App.1978). Our courts have also held that "[t]here is a *'vast distinction'* between the violation of a rule of an employer that would justify the discharge of the employee and a violation of such rule that would warrant a determination of misconduct connected with the employee's employment so as to disqualify him for unemployment compensation benefits." *Pemiscot County Mem'l Hosp. v. Missouri Labor & Indus. Relations Comm'n,* 897 S.W.2d 222, 226[1] (Mo.App. 1995) (emphasis added).

In its point relied on, Employer contends that Shipman engaged in three types of activities that amount to "misconduct connected with his work" under § 288.050.2. First, Employer contends that "Shipman used city employees under his supervision to work on his farm while the employees were on duty with the city which resulted in false time records being submitted." Second, Employer points to evidence that "Shipman used city employees under his supervision to run personal errands for him while on duty with the city." Finally, Employer points to evidence that "Shipman used city employees, facilities and materials to repair Shipman's personal property."

As an initial matter, we note that Employer's argument regarding the second type of activity, i.e., using employees to run his personal errands, is strikingly sparse. The only passage pertaining to that type of activity contained in its argument is the following:

> "[Employer] submits that in Shipman using City employees to do work on his farm, *as well as the other incidents of personal errands performed by employees form* [sic] *Shipman at his request set out in the record,* with the employee supposedly receiving Shipman's comp time and then submitting falsified time records which shows both Shipman and the employee working for the City on those occasions and which results in both being paid for that time by the City is a wanton and wilful disregard of Shipman's obligation to the City and thus constitutes misconduct in connection with his employment sufficient to deny unemployment benefits." (Emphasis added.)

"An appellant must develop the contention raised in the point relied on in the argument section of the brief." *Luft v. Schoenhoff,* 935 S.W.2d 685, 687[5] (Mo.App.1996). "Arguments raised in the point relied on which are not supported by argument in the argument portion of the brief are deemed abandoned and present nothing for appellate review." *Id.* at 687[4]. We do not view the excerpt above as sufficient "development" of or "support" for Employer's contention that Shipman used city employees to run his personal errands to preserve the issue for our review. We, therefore, deem that issue abandoned.

As to the other types of "misconduct" alleged by Employer, the Commission found as follows:

> "The employer had an histori[c]al practice of allowing employees such as [Shipman] and his coworkers to trade around comp time and vacation time so they could perform personal duties for one another. In [Shipman's] situation, he allowed coworkers to use his comp time

to perform various personal duties for him while he worked for them at the power plant. That resulted in [Shipman's] coworkers being fully paid for a full week['']s work, because [Shipman] performed their duties for them. The employer also allowed employees such as [Shipman] and his coworkers to use the employer's facilities to perform maintenance work on their personal property. The work was to be done when the employees were not on duty. [Shipman] and a number of his coworkers were skilled in their lines of work and had outside businesses. [Shipman] and his coworker, on occasion, utilized one another to perform various duties, . . . utilizing this comp or vacation time switching plan. The on site supervisors maintained a record of those switches until the last few months of [Shipman's] employment when the record keeping became more centralized. Though the employer was uncomfortable with not knowing for sure that a particular employee actually worked at the employer's work site for the hours shown for each pay period the employer never advised [Shipman] or his coworkers during the period of [Shipman's] employment that the comp and vacation time switching practice was improper or disallowed. [Shipman] as well as his coworkers utilized the employer's facilities to do repairs on their personal property as was allowed by the employer's policies. At some time in the past, [Shipman] had a coworker spray paint a tool box he placed in the bed of [Shipman's] pickup at the work site. The evidence is not clear as to whether or not that work was done on break time or when employees were on the clock for the employer. [Shipman] in fact was having the tool box readied so it could be utilized as a luggage carrier on a trip in his personal vehicle with another coworker to a meeting in Houston, Texas the following week on the employer's behalf."

These findings are supported by competent and substantial evidence as reflected in our recitation of the facts, above. Further, Employer does not complain that these findings were procured by fraud, nor do we find any basis for such a complaint. As a result, we must defer to these findings. *See* § 288.210. Thus, the only issue we must decide is whether, as a matter of law, Shipman's activities in this case constitute § 288.050.2 "misconduct" as defined by case law. We conclude that, under the circumstances, Shipman's activities do not rise to the level of "misconduct" such that he should be disqualified from receiving unemployment benefits.

As to Shipman's practice of "giving" his comp and vacation time to his coworkers while they performed services for him during regular working hours, the evidence showed and the Commission found that such arrangements had been "an historical practice" among Employer's employees and were not unique to Shipman. There is no evidence that Employer ever developed a policy disallowing such arrangements or that Employer notified Shipman or any other of its employees that this practice would no longer be allowed. For all intents and purposes, it appears that Shipman's conduct was not violative of Employer's policies but was, instead, in keeping with Employer's "historical practice." If Shipman's conduct did violate Employer's policies, then Employer has failed to adduce any evidence of such policies and has failed to meet its burden on the issue.

Employer contends, nevertheless, that Shipman was solely responsible for tracking his and his subordinates' comp time separate and apart from the time sheets and vacation records that were turned in to Employer and, as a result, there was no way for Employer to verify whether Shipman was keeping accurate records of the exchanges of comp time. It further asserts that "[n]o comp time records were submitted by Shipman at the hearing." Employer seems to be suffering from the misguided belief that Shipman bore some burden of proof on this issue. As stated

above, when an employer alleges it discharged an employee for misconduct connected with his work under § 288.050.2, *the employer* bears the burden of proving that allegation. *See Miller,* 996 S.W.2d at 124[6]. Shipman was not required to produce any evidence on this issue. Employer failed to produce any evidence that Shipman was required by policy, rule, or otherwise, to transmit the comp time records he kept for himself and his subordinates to Employer. It seems more likely, based on the evidence, that Employer committed the task of tracking power plant employees' comp time to Shipman alone.

Under the circumstances, we cannot conclude that Shipman's practice of "giving" his comp and vacation time to other employees amounted to "misconduct" as that term is used in § 288.050.2 and interpreted by Missouri courts.

We turn, then, to the issue of whether the performance of work on Shipman's personal toolbox by Shipman and his coworkers constituted "misconduct." There seems to be no dispute that Employer's employees were free to use the power plant shop "after hours." The dispute centers on whether the work was conducted "after hours" and whether the fact that some of the work was performed by Shipman's coworkers was improper.

Although the evidence suggests that the work on Shipman's toolbox was performed during regular working hours at the plant, the evidence could also support the conclusion that any such work was performed during Shipman's and his coworkers' regular breaks. The Commission found that the evidence on this issue was "not clear." If we take the evidence and all reasonable inferences in favor of the Commission's decision, as we must, then we can only conclude that the work was performed by Shipman and his coworkers during their regular breaks. Whether work performed during breaks in regular working hours complies with the Employer's apparent policy that personal use of the shop was to be made "after hours" we decline to decide. We believe that even if the "after hours" designation could be construed as prohibiting employees from working on their personal projects during regular breaks in their working schedule, the violation of that policy on one occasion does not amount to "misconduct" as defined by case law in the context of § 288.050.2. *See Pemiscot County Mem'l Hosp.,* 897 S.W.2d at 226. Furthermore, the evidence showed and the Commission found that Shipman and his coworkers worked on the toolbox in anticipation that Shipman would be using the box during his trip to Texas on business for Employer. This scenario simply does not support a finding of "misconduct."

Finally, we find it significant that Employer did not present any evidence—documentary or testimonial—to establish that the instances of "misconduct" now cited by Employer actually led to or formed the basis for Employer's decision to dismiss Shipman. This glaring omission significantly undermines Employer's present contentions.

We conclude that the Commission's findings are supported by competent and substantial evidence. We further agree with the Commission's conclusion that Shipman was not dismissed for misconduct connected with his work. Accordingly, we affirm the decision of the Commission.

CROW, P.J., concurs.

PARRISH, J., concurs.