**Bradley BANGTSON, Relator,**

v.

**ALLINA MEDICAL GROUP (Corp), Respondent,**

**Department of Employment and Economic Development, Respondent.**

**No. A08–1587.**

Court of Appeals of Minnesota.

June 9, 2009.

Dennis B. Johnson, Gary K. Luloff, Chestnut & Cambronne, P.A., White Bear Lake, MN, for relator.

Robert L. Bach, Jessica M. Marsh, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN, for respondent.

Lee B. Nelson, Katrina I. Gulstad, Minnesota Department of Employment and Economic Development, St. Paul, MN, for respondent-department.

Considered and decided by PETERSON, Presiding Judge; MINGE, Judge; and CONNOLLY, Judge.

## OPINION

CONNOLLY, Judge.

An unemployment-law judge (ULJ) determined that (1) relator's employment

was not terminated upon receiving a notice of discharge, and (2) relator was ineligible for unemployment benefits because his assault of a co-worker, which occurred after receiving the notice of discharge, constituted employee misconduct. Appellant challenges that determination, arguing that his discharge was effective immediately upon receiving the notice of discharge. We affirm.

## FACTS

Cambridge Medical Center (CMC) is a regional health facility that is part of respondent Allina Medical Group (Allina). Relator Dr. Bradley Bangtson began his employment with Allina on December 1, 2002. He served as an anesthesiologist and director of anesthesia services at CMC. His final pay rate was $30,700 per month.

In April 2007, a staff member at CMC brought it to Allina's attention that relator was diverting narcotics. On or about April 19, 2007, relator met with Dennis Doran, CMC's president, and Dr. Dale Berry, CMC's lead physician. At this meeting, relator admitted to diverting medications on three occasions for his own use.[1] In response, relator began a paid leave of absence on April 23, 2007, during which he underwent treatment at Hazelden from May 3 through June 2, 2007. In relator's words, he was treated for "drug abuse. Not drug addiction, but drug abuse" while at Hazelden.[2]

On July 12, 2007, relator's employment was discussed at an executive operations meeting. At this meeting, it was determined that relator could not return to work for Allina because his drug diversion had created a concern for patient safety and a loss of trust. Regarding the concern for public safety, Dr. Berry testified, "I could not assure patient safety to the degree that I felt comfortable" because of relator's drug diversion. When asked to elaborate, Dr. Berry testified:

Well, what happens is that if you have, for example, a staff person who has lost trust with [relator] who's then involved with, let's say, a person who stops breathing or who has a cardiac condition, will they then accept the orders [from relator,] will they understand and believe that this person is not impaired, particularly if it's an order that for some reason doesn't make perfect sense to them. We don't have time at that time to, you know, to be quibbling about that, *a patient's life is at stake*, and particularly in anesthesia, where things happen very rapidly. So the stakes are very high and the loss of, the loss of trust is an enormous issue when it comes to patient safety in the operating room and in the recovery room.

(Emphasis added.)

On July 16, 2007, Doran and LeeAnn Vitalis, CMC's director of human resources, met with relator to discuss his future employment. They provided him with a document entitled "Separation and Release Agreement," which stated, in pertinent part, that "Employee and Employer acknowledge and confirm that Employee's employment *will* terminate on July 20, 2007 ('Date of Termination')." (Emphasis

---

1. Relator was diverting two powerful opiates, Fentenyl and Versed. He stated that he was using these medications as sleep aids because he was unable to get a pre-existing prescription for Ambien refilled. When asked if he thought the diversion of such "potent controlled substance[s]" was a "serious offense," relator replied: "I don't think so, no."

2. Relator had previously undergone treatment at Hazelden in October 2001 for alcohol abuse.

added.) During this meeting, relator displayed, in the words of Vitalis, "upsetting" behavior. Relator threw his soda with enough force to spill its contents "everywhere" in the room. He then approached Doran and began pointing his finger at him while insulting him with a raised voice.[3] This threatening behavior prompted Vitalis to leave the room so that she could ask a secretary to call security. While Vitalis was doing this, relator left the meeting room; however, he re-entered shortly after Vitalis returned to the room. Relator then began yelling at Vitalis, saying "How can you sleep at night?" and other similar comments.

As this was going on, Doran, who had also left the meeting room, returned and told relator that he needed to leave. In response, relator demanded to collect his personal items from his office. Doran replied that relator's personal items could be mailed to him. Relator rejected this proposal, stating that he didn't trust Doran and that he wanted to get the items from his office himself. Doran acquiesced, and escorted relator to his office.[4] Upon entering his office, relator began to pack a few items, but he stopped shortly thereafter. He then picked up a mirror, smashed his fist through it, and told Doran that "should have been your face." Doran then told relator that it was time to leave. Relator and Doran then left relator's office, but before Doran could escort relator out of the building, relator set down the box containing his personal items, and told Doran "Let's have it out." Before Doran had a chance to react, relator grabbed his throat and pushed him back so Doran hit his head on a coat hook. Relator then grabbed Doran's tie and attempted to flip him. Doran then began calling for security. Relator released Doran's tie and began walking away. Doran next saw relator walking across the building's parking lot. Doran then observed security approach relator, who, after catching sight of security, proceeded to flee the grounds on foot.

Following this egregious and violent episode, Allina informed relator, by a letter dated July 18, 2007, that "due to [his] assault of Dennis Doran at Cambridge Medical Center on July 16, your employment effectively ended on that day." Relator received this letter on or about July 19, 2007.

Relator applied for unemployment benefits. On October 5, 2007, a Minnesota Department of Employment and Economic Development (DEED) adjudicator made an initial determination that relator was eligible for benefits. Allina appealed that determination, and a de novo hearing was held before a ULJ. Following a three-day hearing, the ULJ determined that relator was discharged for employment misconduct and was, therefore, ineligible for unemployment benefits. Relator filed a request for reconsideration with the ULJ, who, on August 12, 2008, affirmed her earlier decision. Relator filed this certiorari appeal on September 11, 2008 pursuant to Minn.Stat. § 268.105, subd. 7(a)(2008) and Minn. R. Civ.App. P. 115.

## ISSUE

**Is an employee who commits misconduct after receiving a notice of future discharge but before the discharge is scheduled to occur eligible for unemployment benefits?**

## ANALYSIS

When reviewing the decision of a ULJ,

---

**3.** Vitalis testified that relator "said something to the effect of 'you should have a stronger backbone' or 'you're spineless' or something like that."

**4.** While walking to relator's office, Doran waived off security because he thought their presence was "more obvious than necessary."

[t]he Minnesota Court of Appeals may affirm the decision of the unemployment law judge or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioner may have been prejudiced because the findings, inferences, conclusion, or decision are:

(1) in violation of constitutional provisions;

(2) in excess of the statutory authority or jurisdiction of the department;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) unsupported by substantial evidence in view of the entire record as submitted; or

(6) arbitrary or capricious.

Minn.Stat. § 268.105, subd. 7(d) (2008); *see Ywswf v. Teleplan Wireless Servs., Inc.,* 726 N.W.2d 525, 529 (Minn.App.2007) (citing this standard of review).

 "We view the ULJ's factual findings in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ. In doing so, we will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Skarhus v. Davanni's Inc.,* 721 N.W.2d 340, 344 (Minn.App.2006) (citations omitted). "Credibility determinations are the exclusive province of the ULJ and will not be disturbed on appeal." *Id.* at 345. When addressing a question of law, this court is "free to exercise [ ] independent judgment." *Jenkins v. Am. Express Fin. Corp.,* 721 N.W.2d 286, 289 (Minn.2006).

 We first address whether, for purposes of determining eligibility for unemployment benefits under Minn.Stat.

§ 268.095, a notice of discharge is not a discharge when employment in any capacity is available to the employee who receives the notice.

Relator was not discharged when he was presented with the separation and release agreement on July 16 because, under the laws and statutes of Minnesota, a notice of a future discharge is distinct from a discharge. A "discharge" occurs "when any words or actions by an employer would lead a reasonable employee to believe that the employer will no longer allow the employee to work for the employer in any capacity." Minn.Stat. § 268.095, subd. 5(a) (2008). Relator argues that the separation-and-release agreement containing the notice of discharge acted as a discharge because it would lead a reasonable employee to believe that he would no longer be able to work at Allina in any capacity. From this, relator argues that his misconduct occurred after his discharge and, as a result, that he should be eligible for unemployment benefits. This interpretation ignores the plain language of the agreement, which stated that relator's "employment *will* terminate on July 20, 2007." (Emphasis added.) This language did not purport to terminate relator effective immediately; instead, it explicitly put relator on *notice* that Allina had the intent to discharge him at a future date.[5]

 Our conclusion that relator was not discharged when given a notice of future discharge is confirmed by Minnesota's unemployment statutes, which recognize a distinction between a discharge and a notice of discharge at a future date: "An employee who has been notified that the employee will be discharged in the future,

---

5. Relator argues this document is not pertinent to our analysis because it is unsigned. We disagree. Although the terms of the agreement are not binding because it was not signed by relator, the agreement did serve to put relator on notice that Allina intended to terminate his employment on July 20.

who chooses to end the employment while employment in any capacity is still available, is considered to have quit the employment." Minn.Stat. § 268.095, subd 2(b). As this statute illustrates, an employee can receive a notice of discharge and then proceed to end his employment before the discharge is effective. When this happens, the employee is considered to have quit his employment. *Id.* If a notice of discharge were to automatically act as a discharge, then it would be impossible for an employee to voluntarily end his employment prior to the date of the future discharge. This is an interpretation that is both illogical and against the statute's plain language. As a result, we decline to adopt it. *See, e.g.,* Minn.Stat. § 645.16 (2008) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."); Minn.Stat. § 645.17 (2008) (stating courts presume that the legislature does not intend results that are absurd). Instead, we hold that a notice of discharge does not constitute an immediate discharge when continuing employment in any capacity is still available to the employee who receives the notice of discharge. Appellant argues that *Fiskewold* runs contrary to this holding. *Fiskewold v. H.M. Smyth Co., Inc.,* 440 N.W.2d 164 (Minn.App.1989). However, *Fiskewold* was decided under a statutory scheme that did not contain the language found in Minn.Stat. § 268.095, subd. 2(b). *See* 1999 Minn. Laws ch. 107, § 44 (containing an amendment adding the language at issue in this case). As a consequence, its reasoning is not dispositive in the present controversy.

Turning back to the issue presented by this appeal, relator was notified by the separation-and-release agreement that Allina intended to discharge him at a future date. Continuing employment was available to relator between the date that he received the agreement and the date that he was informed he would be discharged.[6] Under these circumstances, the separation-and-release agreement is a notice of discharge, not a discharge. If it were considered a discharge, then it would have been impossible for him to voluntarily quit employment after receiving the notice but while employment was still available, a step contemplated by Minn.Stat. § 268.095, subd. 2(b).

Applicants are ineligible for unemployment benefits if they commit employee misconduct. Minn.Stat. § 268.095, subd. 4(1). Employee misconduct is defined as "any intentional, negligent, or indifferent conduct, on the job or off the job (1) that displays clearly a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee, or (2) that displays clearly a substantial lack of concern for the employment." Minn.Stat. § 268.095, subd. 6. It is beyond dispute that relator's completely unwarranted and unprovoked assault on Doran is employee misconduct.

Thus, because relator was not discharged at the time that he assaulted Doran and because his assault clearly constitutes employee misconduct, relator is ineligible for unemployment benefits.

### DECISION

Because the notice of future discharge received by relator did not constitute an

---

6. The ULJ found that "continuing employment was available to [relator.]" This finding has substantial support in the record. The ULJ asked Doran, "At the time of the meeting to meet about the separation agreement, was continuing employment still available to [relator?]" Doran replied "[U]ntil July 20." *See Skarhus,* 721 N.W.2d at 344 (stating that we view the ULJ's factual findings in the light most favorable to the decision).

**334**

immediate discharge, the ULJ did not err in concluding that relator's employee misconduct, which triggered his immediate discharge but which occurred after he received the notice of future discharge, makes him ineligible for unemployment benefits.

**Affirmed.**