*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0730**

Anthony Browne,
Relator,

vs.

M. A. Mortenson Company, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed January 23, 2017
Reversed and remanded
Halbrooks, Judge**

Department of Employment and Economic Development
File No. 34273692-3

Thomas H. Boyd, John N. Sellner, Winthrop & Weinstine, P.A., Minneapolis, Minnesota
(for relator)

M.A. Mortenson Company, Inc., c/o TALX UCM Services Inc., St. Louis, Missouri
(respondent employer)

Lee B. Nelson, Minnesota Department of Employment and Economic Development,
St. Paul, Minnesota (for respondent department)

        Considered and decided by Rodenberg, Presiding Judge; Halbrooks, Judge; and

Kirk, Judge.

UNPUBLISHED OPINION

**HALBROOKS**, Judge

In this certiorari appeal, relator challenges the unemployment-law judge's (ULJ's) denial of his unemployment benefits, arguing (1) that the ULJ erred by determining that he took a voluntary leave of absence or (2) in the alternative, if he quit, it was for a reason that does not disqualify him from receiving unemployment benefits. We reverse and remand.

**FACTS**

Relator Anthony Browne and his wife have two children, ages 11 and 13. Browne's wife is employed by Delta Air Lines. She is the primary childcare provider and his mother is the secondary provider. Browne's mother helps care for his children, but she also works and cares for her other grandchildren. Because the children attend a school that is outside their district, Browne's wife drops them off in the morning and picks them up in the afternoon. After school, either Browne, his wife, or his mother are with the children.

Browne is a member of his local cement masons' union. He has worked for Rainbow, a construction company, for several years; Rainbow seasonally discharges Browne every December when its workload declines due to weather. Because construction work is seasonal and he is routinely discharged, Browne has maintained an unemployment-benefits account since 2008. During the winter, Browne helps care for his children while his wife increases her work schedule to offset his unemployment. But he continues to be available for employment while caring for his children.

Rainbow discharged Browne in mid-October 2014, which was earlier than usual. Respondent M.A. Mortenson Co., another construction company, hired him as a cement

mason shortly thereafter. When Mortenson hired Browne, Browne's supervisor stated that he anticipated layoffs in December due to the weather "and [Browne] would be the first one to get laid off." Browne's hours at Mortenson were 7:00 a.m. to 3:00 p.m. While Browne worked for Mortenson, he continued to care for his children with his mother's help.

On December 8, 2014, Browne told his supervisor that he was unable to continue working for Mortenson because he needed to care for his children. Browne testified that Mortenson could not reasonably accommodate his childcare needs. Although he stated that he could still work for another two weeks, Browne's supervisor told him that he would be separated from employment on December 12, 2014, and that his employment with Mortenson could be reassessed in January or February 2015. Then, on December 11, 2014, one day before his expected separation, Browne informed his supervisor that his mother was hospitalized, and his supervisor immediately discharged him.

Browne's supervisor filled out a human-resources action form that indicated that Browne's separation was involuntary due to workforce reduction. The following day, his supervisor completed a second human-resources action form, stating that Browne voluntarily resigned because he "went back up north." Browne established an unemployment benefits account effective December 14, 2014, and began collecting benefits.

Browne returned to work at Rainbow in February 2015. Rainbow discharged him in November 2015, and he applied for another unemployment-benefits account. Respondent Minnesota Department of Employment and Economic Development (DEED)

notified Mortenson of Browne's application for unemployment benefits in December 2015. Mortenson challenged this application, claiming that Browne voluntarily quit without notice in December 2014.

DEED determined that Browne is ineligible to receive unemployment benefits from December 7, 2014 to April 4, 2015, because he voluntarily quit "for a personal reason not related to the employment." Browne appealed this determination, arguing that Mortensen "made a clerical error in processing [his] paperwork upon separation in December 2014."

The ULJ held an evidentiary hearing pursuant to Minn. Stat. § 268.105, subd. 1 (2016). At the hearing, the ULJ stated that DEED determined that he "quit his employment for personal reasons" and the issue of his eligibility for unemployment benefits "revolve[d] around the nature of and the reasons for [his] separation from employment." Browne, his wife, and his mother appeared at the hearing. No one from Mortenson participated. But the ULJ's record included documents that were prepared by Mortenson's agent, Equifax, in January 2016. Those documents stated that Browne voluntarily quit without notice and without offering a reason for quitting. The record also included Mortenson's human-resources action forms, which inconsistently indicated that Brown was involuntarily discharged and voluntarily quit.

Browne testified that, when Mortenson hired him, he told his supervisor that he would need to take care of his children in December because his wife would be working a more rigorous schedule. Browne stated that he approached his supervisor again on December 8, 2014, "saying that [he was] not able to [work] anymore based off of schedules" and childcare needs. He testified that Mortenson could not make any

4

reasonable accommodations. Then, the ULJ asked whether Browne believed his separation from Mortenson was a leave of absence:

> Q Okay, all right. And so I mean did you view this as a quit[?] I mean I know these forms say layoff, but I mean there was work available for you if you'd chosen to stay was there not[?]
>
> A Yes there was additional work. But I was not able to based off of my schedule and child-care. My schedule, I misspoke, I apologize. I'm very anxious about this which is unnerving. With my children's schedules with start times and finish time with their school days and heavy construction that level of accommodation on a daily basis is not allowed. An occasional situation such as this, I'm at work right now sitting in the car. These types of isolated and unique events are accommodated.
>
> Q Okay, so but you weren't asking for a leave of absence that you'd be returning[?] I mean this was an end to the employment[?]
>
> A To the contrary. As I stated in exhibit, let me find this, I apologize, in my questionnaire, yes exhibit 3 page 2 I believe it is, excuse me page 1 of exhibit 3. When you look at the preformatted question, what was your employer's response, yes I could have four to six weeks of layoff, to quote my response. Jay Cronstrom (ph) my reporting and hiring foreman was okay with me having a gap of time to be able to sort out my wife's schedule and child-care, subsequently my mother's hospitalization. It was left open-ended where either one of us were able to call each other and reassess. That call never occurred. I went back to Rainbow in that timeframe in February.
>
> Q All right, so you took a voluntary leave of absence. Would that be accurate[?]
>
> A Yes it was.
>
> Q Okay.
>
> A Well however I would like to refine that. Voluntary means that was elective. I don't view it as . . .
>
> Q Let me just say. Under the statute for unemployment purposes there's a definition of voluntary leave of absence and basically it means that there's work available, the employer has work available that the employer, that the employee is capable of performing but elects not to. And so it's voluntary in that

5

sense that as opposed to quitting where you know a leave of absence would leave open the question of perhaps returning at some point. Quitting pretty much closes that door. So it wasn't the employer laying you off due to a lack of work. Is that accurate[?]

A    That is.

Browne also challenged the accuracy of Mortenson's human-resources form stating that he quit, testifying that he has no connections to northern Minnesota or plans to go there, contrary to the stated reason for leaving work on the human-resources form.

The ULJ concluded that Browne is ineligible for unemployment benefits because, although continuing work was available with Mortenson, Browne asked to be relieved from his duties. Because "it was [his] choice to make himself unavailable to [Mortenson]," the ULJ found that Browne took a voluntary leave of absence. The ULJ's determination resulted in an overpayment of $4,431 to Browne's unemployment-benefits account.

The ULJ affirmed his decision upon Browne's request for reconsideration, reasoning that Browne would not have needed to approach his supervisor if work had come to an end, and, therefore, Browne asked to stop working. The ULJ addressed Mortenson's conflicting human-resources forms by stating that, regardless of whether Browne quit or took a leave of absence, he is ineligible to receive unemployment benefits. Neither decision by the ULJ addressed Browne's childcare needs. This certiorari appeal follows.

**D E C I S I O N**

**I.**

Browne argues for the first time on appeal that the ULJ erred by considering Mortenson's responses to DEED's determination-of-benefits-account notices because its

6

responses, which were received almost one year after he left Mortenson, were not timely. We will not generally consider matters not argued to and considered by the ULJ. *Peterson v. Ne. Bank—Minneapolis*, 805 N.W.2d 878, 883 (Minn. App. 2011) (citing *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988)). But we may consider matters not argued before the ULJ in the interest of judicial economy. *Bode v. Minn. Dep't of Nat. Res.*, 612 N.W.2d 862, 869 (Minn. 2000). Although Browne did not make this argument in his initial appeal from the determination of ineligibility, at the evidentiary hearing, or in his request for reconsideration of the ULJ's decision, we choose to address it in the interest of judicial economy.

Browne asserts that the ULJ erred by permitting Mortenson to raise an issue of ineligibility because DEED should not have notified the company that he established a benefits account. He contends that the commissioner should only notify all employers that he was required to list on his unemployment application. *See* Minn. Stat. § 268.101, subd. 1(b) (2016). But DEED must also notify all base-period employers that an applicant has established a benefits account "in order to provide the employer an opportunity to raise, in a manner and format prescribed by the commissioner, any issue of ineligibility." *Id.* A base-period employer is any person who employed the applicant in the "most recent four completed calendar quarters before the effective date of an applicant's application for unemployment benefits." Minn. Stat. § 268.035, subds. 4(a), 14 (2016). Moreover, the "commissioner may issue a determination on an issue of ineligibility within 24 months from the establishment of a benefit account based upon information *from any source*, even

7

if the issue of ineligibility was not raised by the applicant or an employer." Minn. Stat. § 268.101, subd. 2(e) (2016) (emphasis added).

Because Browne's unemployment benefits account became effective in either November 2015 or December 2015, the relevant base period ran between October 1, 2014, and September 30, 2015. *See* Minn. Stat. § 268.035, subd. 4(a). Mortenson is a base-period employer because it employed Browne within that period, and DEED was required to notify Mortenson that Browne established a benefits account.

We conclude that the ULJ did not err by considering Mortenson's responses. DEED was required to notify Mortenson that Browne established an unemployment-benefits account, and even if DEED did not notify Mortenson, Mortenson's responses were within 24 months of the establishment of Browne's benefits account.

## II.

Browne contends that the ULJ erred because the determination that he took a voluntary leave of absence from Mortenson is not supported by substantial evidence in the record. The ULJ found that Browne "asked to be relieved of his duties" and that he took a voluntary leave of absence because he "could return [to work] when his family responsibilities stabilized." We may affirm the ULJ's decision, remand the case for further proceedings, or reverse or modify it if the applicant's substantial rights "may have been prejudiced because the findings, inferences, conclusion, or decision are: . . . (5) unsupported by substantial evidence in view of the entire record as submitted; or (6) arbitrary or capricious." Minn. Stat. § 268.105, subd. 7(d) (2016); *see also Bangtson v. Allina Med. Grp.*, 766 N.W.2d 328, 331-32 (Minn. App. 2009).

8

Whether an employee took a voluntary leave of absence is a question of fact. *See Goodwin v. BPS Guard Servs., Inc.*, 524 N.W.2d 28, 29 (Minn. App. 1994) (concluding, similarly, that a ULJ's finding that an employee quit or was discharged are also findings of fact). We review "findings of fact in the light most favorable to the ULJ's decision and will rely on findings that are substantially supported by the record." *Fay v. Minn. Dep't of Emp't & Econ. Dev.*, 860 N.W.2d 385, 387 (Minn. App. 2015). "Substantial evidence is (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Dourney v. CMAK Corp.*, 796 N.W.2d 537, 539 (Minn. App. 2011) (quotation omitted).

"Leave of absence" is not defined by statute, but it is defined in the dictionary as a "worker's temporary absence from employment or duty with the intention to return." *Black's Law Dictionary* 1028 (10th ed. 2014). A leave of absence is voluntary "when work that the applicant can then perform is available with the applicant's employer but the applicant chooses not to work." *Scheeler v. Sartell Water Controls, Inc.*, 730 N.W.2d 285, 288 (Minn. App. 2007) (citing Minn. Stat. § 268.085, subd. 13a(a) (2004)).

Here, Mortenson does not claim that Browne took a voluntary leave of absence, nor did DEED initially assert ineligibility based on a leave of absence. DEED's initial determination of ineligibility stated that Browne is ineligible to receive unemployment benefits because he voluntarily quit. Mortenson stated that Browne voluntarily quit without notice in its responses to DEED's request for information. Mortenson's first human-resources form stated that Browne was involuntarily separated due to a workforce

9

reduction. Another human-resources form dated the following day stated that Browne voluntarily resigned because he "[q]uit went back up north." Neither form stated that he took a voluntary leave of absence—another option on the form. In its response to DEED's request for information, Mortenson's documents stated that Browne voluntarily quit.

Browne asserts that he did not take a voluntary leave of absence. He testified that he asked his supervisor when he would be laid off and told his supervisor that he could no longer work because he needed to take care of his children on December 8. His supervisor originally told him that he would be separated on December 12, but when Browne told his supervisor that his mother had been hospitalized on December 11, he was separated immediately. Browne testified that his supervisor told him that he could have a "gap of time to be able to sort out [his] wife's schedule and child-care" and the employment relationship "was left open-ended where either one of [them] were able to call each other and reassess." Browne also testified that he "had every intention of returning to work." But he did not specify with which employer, and he ultimately accepted employment with Rainbow in February 2015. The ULJ found that Mortenson "anticipated that Browne *might* return to work at a later time." (Emphasis added.)

DEED now argues that Browne's testimony and prior statements demonstrate that he took a voluntary leave of absence. But DEED originally determined that Browne is ineligible because he voluntarily quit. Browne specifically testified that he did not view his separation as voluntary. It was necessitated by the fact that he had to care for his children while his mother was in the hospital. Moreover, his employer did not characterize his separation as a leave of absence on its human-resources forms or its documentation to

10

DEED. Because Mortenson's inconsistent human-resource forms stated that Browne either quit or was discharged and Browne testified that his leave of absence was not voluntary, we conclude that the substantial evidence as a whole does not support the ULJ's finding that Browne took a voluntary leave of absence.

In order to reverse and remand this case, we must also conclude that Browne's substantial rights were prejudiced as a result of this error. Minn. Stat. § 268.105, subd. 7(d). Browne argues that he is eligible for unemployment benefits regardless of whether Mortenson discharged him or he voluntarily quit because, even if he quit, it was for a qualifying reason. "Whether an employee had good cause to quit is a question of law, which we review de novo." *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012) (quotation omitted). And ULJs "have a duty to reasonably assist pro se parties with the presentation of the evidence and the proper development of the record." *White v. Univ. of Minn. Physicians Corp.*, 875 N.W.2d 351, 355-56 (Minn. App. 2016).

"An applicant who quit employment is ineligible for all unemployment benefits" unless an exception applies. Minn. Stat. § 268.095, subd. 1 (2016). Because the ULJ did not make a finding that Browne quit, the ULJ did not address whether he quit for a nondisqualifying reason. *See* Minn. Stat. § 268.085, subd. 13a(c) (2016) ("A voluntary leave of absence is not considered a quit . . . ."). Instead, the ULJ held that Browne is ineligible for unemployment benefits regardless of whether he quit or took a leave of absence.

Browne asserts that the ULJ's conclusion that his eligibility status would not change regardless of whether he quit or took a leave of absence is legally incorrect. We agree. An

applicant who voluntarily quits is ineligible to receive unemployment benefits unless "the applicant's loss of child care for the applicant's minor child caused the applicant to quit the employment, provided the applicant made reasonable effort to obtain other child care and requested time off or other accommodation from the employer and no reasonable accommodation is available." Minn. Stat. § 268.095, subd. 1(8). An applicant must still be available for suitable employment at the time he seeks to collect benefits. *Id.* An applicant is available for suitable employment if the applicant "is ready, willing, and able to accept suitable employment." Minn. Stat. § 268.085, subd. 15(a) (2016).

Here, the ULJ noted that Browne's availability to perform suitable employment was "real questionable" but it did not determine whether he was available for suitable employment. Similarly, the ULJ did not make any finding addressing Browne's request for reasonable accommodation or whether he made reasonable efforts to obtain other childcare.

At the evidentiary hearing, Browne testified that his supervisor told him that Mortenson could not make any accommodations. He also testified that, except during his mother's three-day hospitalization, he made himself available for work through his local union and sought other work. But he told his supervisor at Mortenson that he could not work "based off of [his] schedule and child-care [needs]." And the record is silent with respect to Browne's efforts to obtain other childcare.

We conclude that the substantial evidence in the record does not support the ULJ's finding that Browne took a voluntary leave of absence because DEED's initial determination of ineligibility and Mortenson's documentation, including its human-

resources forms, state that Browne voluntarily quit or was discharged. Because substantial evidence in the record as a whole does not support the ULJ's finding that Browne took a voluntary leave of absence, we reverse and remand for additional findings. If the ULJ concludes that Browne voluntarily quit, the ULJ has a duty to fully develop the record to determine whether Browne may be eligible for benefits under the childcare exception. *See White*, 875 N.W.2d at 355-56.

**Reversed and remanded.**