*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0953**

Renee Raygor,
Relator,

vs.

Stewart & Associates, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed March 2, 2026**
**Affirmed**
**Ede, Judge**

Department of Employment and Economic Development
File No. 51422583

Renee Raygor, Bloomington, Minnesota (self-represented relator)

Stewart & Associates, Inc., Burnsville, Minnesota (respondent employer)

Melannie M. Markham, Keri A. Phillips, Katrina Gulstad, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Ede, Presiding Judge; Ross, Judge; and Johnson, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

In this certiorari appeal, relator challenges an order by an unemployment-law judge (ULJ) affirming the ULJ's earlier decision that relator quit her employment, that she was therefore ineligible for unemployment benefits, and that no ineligibility exceptions apply.

Because we conclude that substantial evidence supports the ULJ's order, including its credibility determinations, we affirm.

**FACTS**

From October 21, 2024, to January 3, 2025, relator Renee Raygor worked as a full-time sales specialist for respondent-employer Stewart & Associates, Inc. Stewart & Associates is an insurance agency owned by Calvin Stewart. After her employment with Stewart & Associates ended on January 3, 2025, Raygor filed for unemployment benefits. Respondent Department of Employment and Economic Development (DEED) determined that Stewart & Associates had discharged Raygor based on employment misconduct and that Raygor was therefore ineligible for unemployment benefits.[1]

Raygor appealed that determination and requested a hearing before the ULJ. Before the hearing, Stewart & Associates and Raygor submitted thirteen exhibits, which included written statements by both parties about why Raygor's employment had ended and several written communications between Stewart and Raygor. During the hearing, Stewart and Raygor testified. In a written decision filed after the hearing, the ULJ determined that Raygor had quit her employment with Stewart & Associates, that she is ineligible for unemployment benefits, and that no ineligibility exceptions apply. Following Raygor's request for reconsideration of that decision, the ULJ filed an order of affirmation in which the ULJ determined that its earlier decision was factually and legally correct. The following factual summary stems from the findings of fact set forth in the ULJ's decision and, as

---

[1] DEED "is the primary responding party to any judicial action involving an unemployment law judge's decision." Minn. Stat. § 268.105, subd. 7(e) (2024).

relevant to Raygor's appellate challenge to a credibility determination by the ULJ, the hearing record.

When Raygor began working for Stewart & Associates on October 21, 2024, Stewart and Raygor had a general agreement that, unless they specifically discussed a different schedule, Raygor would work from home on Mondays and work in the office on other days. Raygor's employment with Stewart & Associates started with a probationary period scheduled to end on January 19, 2025. Stewart eventually assigned Raygor some non-sales tasks and eliminated her sales goals as unrealistic based on the company's book of business.

In December 2024, Stewart inquired with another agency about hiring Raygor because he anticipated possibly discharging her at the end of her probationary period, and the other agency responded by contacting Raygor. That same month, Stewart allowed Raygor to work from home during the week of Christmas, although he expected her to work in the office on Tuesday, December 31, 2024, and Friday, January 3, 2025. When Raygor instead worked from home both days, Stewart sent Raygor an electronic communication asking where she was. Stewart and Raygor spoke by telephone at the end of the day on January 3. He informed her that she was not permitted to unilaterally decide to work from home and that "she could either commit to coming to the office or [January 3] could be her last day." After Raygor responded by telling Stewart that January 3 "would be her last day," he told her that "he would come pick up her company equipment."

In its decision, the ULJ made a credibility determination because "[t]he parties disputed what was said at the end of the phone call on January 3." The ULJ explained that

3

"Raygor claimed that Stewart said that he was going to have to let her go for financial reasons" and that, "shortly after the [January 3] conversation, she texted an acquaintance and wrote [that] 'he basically just fired [her].'"

At the hearing, Raygor testified that she believed Stewart would tell her if she needed to be in the office during the week of the New Year's holiday—Monday, December 31, 2024, through Friday, January 3, 2025—because of the risk of exposure to potential illnesses in the office. When Stewart did not inform her that she needed to work at the office throughout that week, Raygor assumed that she could continue working from home. Raygor also stated that Stewart told her that he had to discharge her because "he had hoped that he would have enough money to pay [her] through the end of [her] probationary period, but . . . he didn't have any more money." As support for this assertion, Raygor said that Stewart "had gone to another agent to ask if they had any job openings, and that's when he . . . started to tell [her] about the problems."

Raygor maintained that she was planning to return to the office the following Tuesday, January 7, until the January 3 conversation occurred, and she said that Stewart did not give her the option of returning to the office. She also described a text message she sent to an acquaintance that read, "So he basically just fired me." When the ULJ asked at the hearing why Raygor had used the word "basically," Raygor responded that she "wasn't really sure how to interpret exactly what [Stewart] said" because Stewart "tried to make it sound like he was doing [her] a favor in a way."

During his testimony, Stewart denied telling Raygor that he was discharging her because he did not have money to pay her, explaining that he "never discussed office

4

finances with [her]," that his "office [had] budgeted for her" and "actually need[ed] her," and that "she never missed a paycheck." Stewart admitted that he had contacted another agency about a potential job for Raygor "because she just wasn't hitting sales goals" and he did not think she would "be able to hit [those] goals" after the end of her probationary period. He described his inquiry into another position for Raygor as "forward thinking." Stewart elaborated that, although Raygor "still had some time" given that "her probation wasn't even up until February," he thought that, "as a service specialist [for a different agency], . . . [she would] be good . . . because she knows her stuff."

As to the January 3 phone call, Stewart testified that he told Raygor "[she] need[s] to start coming back into the office or [January 3 could] be [her] last day." According to Stewart, Raygor told him that January 3 would be her last day, that he could "come pick up . . . her work laptop and her work bag," and that she would "just file for unemployment." Stewart also described a communication with his "sales district leader" in which he discussed "what happened when [Raygor] left [him] no choice." He acknowledged that he told his "sales district leader" that he "just had to let [Raygor] go" and that she "left [him] no choice." But Stewart also explained that "the option [he] gave her was that"—apparently referring to his instruction to Raygor that she return to the office or choose to make January 3 her last day—and "when [he] gave her that choice, . . . she accepted it, [and he] accepted it back."

The ULJ ultimately based its findings on Stewart's testimony, which the ULJ determined "was credible because it was clear, consistent, and plausible." As to Raygor's testimony about the text message she claimed to have sent an acquaintance stating that

5

Stewart "basically just fired" her, the ULJ reasoned that, "[i]f Raygor's version of the events were accurate and Stewart had unequivocally and unambiguously told her she was being let go, it is unclear why she would have said 'basically.'" Considering this evidence, the ULJ decided that "[i]t is more likely that Stewart expressed some frustration with Raygor about her working from home and expressed some uncertainty about her prospects with the company, all of which made Raygor believe that her employment was in jeopardy."

Given its credibility determination in favor of Stewart, the ULJ found that, "[o]n January 3, Stewart gave Raygor the option of continuing her employment or having that day be her last day, and she chose the latter," and that "[i]t was Raygor's decision for the employment to end when it ended, not the employer's." The ULJ thus ruled that "[a] preponderance of the evidence shows that Raygor quit her employment." And the ULJ determined that "[a] preponderance of the evidence shows that Raygor did not quit because of a good reason caused by the employer." The ULJ reasoned that "notification of discharge in the future is not a good reason caused by the employer for quitting," such that, "even if Stewart strongly suggested that Raygor's employment was going to end at the end of her probationary period, [that] would not be a good reason caused by the employer for quitting." Moreover, the ULJ explained that "Stewart requiring Raygor to work from the office except for on Mondays was not adverse to Raygor because it was consistent with the agreement they had from the beginning of the employment." The ULJ decided that any disagreement or miscommunication about these work-from-home rules "would not compel an average, reasonable worker to quit and become unemployed." Consequently, the ULJ

6

determined that Raygor quit her employment, that she was therefore ineligible for unemployment benefits, and that no ineligibility exceptions apply.

Raygor requested reconsideration of the ULJ's decision, claiming that there were discrepancies and inaccuracies in Stewart's testimony and that "[a]ll of the evidence that ha[d] been submitted support[ed] the argument that [she] was discharged, not that [she] quit."

The ULJ filed an order of affirmation stating that the ULJ had "fully considered the request [for reconsideration] and determined that the [ULJ's earlier] decision . . . [was] factually and legally correct." While the ULJ acknowledged that "Stewart [had] referred to Raygor being 'discharged' in a questionnaire, and that Stewart [had] testified that he told someone that he 'had to let Raygor go,'" the ULJ ruled that Stewart had nonetheless "consistently asserted that on January 3, [2025,] he gave Raygor the option of committing to coming to the office or having January 3 be her last day, and that she chose the latter." The ULJ explained that Stewart had offered that explanation "in the questionnaire that he [had] completed for unemployment on January 10," "in [an] email [that he had sent] to Raygor on January 13, and in his testimony at the hearing on March 4," which led the ULJ to "credit[] Stewart's testimony about the January 3 conversation and therefore conclude[] that the course of events amounted to a quit, not a discharge, regardless of what words Stewart used to describe the separation." And the ULJ rejected Raygor's argument "that there were 'multiple discrepancies and inaccuracies' in Stewart's testimony" because Raygor did "not provide any specific examples" and did not show "that Stewart likely gave false testimony or that any additional evidence would likely change the outcome of the

7

decision." Because the ULJ determined that "Raygor ha[d] not provided any information or arguments that require[d] changing the decision or ordering another hearing," the ULJ "affirmed [the decision] as factually and legally correct."

Raygor appeals by writ of certiorari.

## DECISION

Raygor challenges the ULJ's order affirming its earlier decision that she quit, that she was ineligible for unemployment benefits, and that no ineligibility exceptions apply. She asserts that the ULJ's order, including its credibility determinations, is not supported by substantial evidence. DEED responds that the record supports the ULJ's order. We agree with DEED.

When reviewing a ULJ's decision, we may: affirm; remand for further proceedings; or reverse or modify the decision, if the relator's substantial rights may have been prejudiced because, as relevant here, the decision is unsupported by substantial evidence in view of the entire record as submitted. Minn. Stat. § 268.105, subd. 7(d) (2024); *see also Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 855 (Minn. App. 2014) ("We may reverse or modify a ULJ's decision if the relator's substantial rights may have been prejudiced because the findings or decision are unsupported by substantial evidence . . . ."), *rev. denied* (Minn. July 15, 2014). An appellate court determines whether a decision has the support of substantial evidence by evaluating: if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; if there is "more than a scintilla of evidence"; if there is "more than some evidence"; if there is "more than any

8

evidence"; or by evaluating "the evidence[,] considered in its entirety." *Minn. Ctr. for Env't Advoc. v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 464 (Minn. 2002).

"When the credibility of a witness testifying in a hearing has a significant effect on the outcome of a decision, the [ULJ] must set out the reason for crediting or discrediting that testimony." Minn. Stat. § 268.105, subd. 1a(a) (2024). "We view the ULJ's factual findings in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ, . . . [and] we will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006) (citations omitted). "Credibility determinations are the exclusive province of the ULJ and will not be disturbed on appeal." *Bangtson v. Allina Med. Grp.*, 766 N.W.2d 328, 332 (Minn. App. 2009) (quotation omitted); *see also Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 530–33 (Minn. App. 2007) (addressing a relator's argument that a "ULJ failed to make statutorily required credibility findings in a case that hinged on the credibility of the parties" and concluding that a "ULJ's findings [were] supported by substantial evidence and provide[d] the statutorily required reason for [the ULJ's] credibility determination").

We conclude that substantial evidence supports the ULJ's order affirming its earlier decision that Raygor quit, that she was ineligible for unemployment benefits, and that no ineligibility exceptions apply.

In particular, the ULJ provided adequate reasons crediting Stewart's testimony, as required by subdivision 1a(a) of Minnesota Statutes section 268.105. The ULJ's order of affirmation acknowledges that "Stewart [had] referred to Raygor being 'discharged' in a

questionnaire, and that Stewart [had] testified that he told someone that he 'had to let Raygor go,'" which are the primary bases on which Raygor claims error on appeal. But the ULJ relied on substantial evidence in the record in finding that Stewart had "consistently asserted that, on January 3, [2025,] he gave Raygor the option of committing to coming to the office or having January 3 be her last day, and that she chose the latter."

More specifically, the ULJ pointed to Stewart's repeated articulation of the foregoing "in the questionnaire that he [had] completed for unemployment on January 10," "in [an] email [that he had sent] to Raygor on January 13, and in his testimony at the hearing on March 4." Substantial evidence in the record bears out this determination by the ULJ. The referenced January 10 questionnaire states:

> [Raygor] was informed that working from home without prior approval was not acceptable, [Raygor] stated that she did not believe in-office attendance was necessary for her role. Additionally, she expressed concerns about exposure to illness due to a lack of healthcare coverage. She was told that this behavior would lead to her termination, and given the options to change her behavior or she would be terminated. [Raygor] decided to quit and hung up the phone, as she believed it was not in her best interest to work in the office without currently having health insurance.

In the referenced January 13 email—which listed "Clarifying the End of Your Employment" as its subject—Stewart wrote to Raygor that, on January 3, he "laid out [her] options: (1) either recommit to meeting the in-office attendance requirements[;] [or] (2) conclude [her] employment." And, as summarized above, Stewart testified that he told Raygor during their January 3 phone call that "[she] needs[s] to start coming back into the

office or [January 3 could] be [her] last day" and that, in response, Raygor told him that January 3 would be her last day.

Based on this record, we conclude that substantial evidence supports the ULJ's determination that Stewart's account "was credible because it was clear, consistent, and plausible," and the ULJ's decision to "credit[] Stewart's testimony about the January 3 conversation" in "conclud[ing] that the course of events amounted to a quit, not a discharge, regardless of what words Stewart used to describe the separation." And we conclude that the ULJ provided statutorily required reasons for this credibility determination per subdivision 1a(a) of Minnesota Statutes section 268.105. *See Ywswf*, 726 N.W.2d at 530–33.[2]

We reach the same conclusion about the ULJ's decision to discredit Raygor's testimony about her text message to an acquaintance, after the January 3 phone call, that Stewart had "basically just fired [her]." The ULJ "set out the reason for . . . discrediting" Raygor's testimony about the email: "If Raygor's version of the events were accurate and Stewart had unequivocally and unambiguously told her she was being let go, it is unclear why she would have said 'basically.'" Minn. Stat. § 268.105, subd. 1a(a). On this basis,

---

[2] As much as Raygor contests on appeal the ULJ's rejection of her assertion that there are "multiple discrepancies and inaccuracies" in Stewart's hearing testimony, we conclude that substantial evidence supports the ULJ's determination that "Raygor has not shown that Stewart likely gave false testimony or that any additional evidence would likely change the outcome of the decision." Despite Raygor's "claim[] that Stewart said that he was going to have to let her go for financial reasons," Stewart's testimony at the hearing, as summarized above, amounts to substantial evidence in support of the ULJ's findings that "Stewart gave Raygor the option of continuing her employment or having . . . [January 3] be her last day and she chose the latter," and that "[i]t was Raygor's decision for the employment to end when it ended, not the employer's." *See Skarhus*, 721 N.W.2d at 344.

11

the ULJ determined that "[i]t is more likely that Stewart expressed some frustration with Raygor about her working from home and expressed some uncertainty about her prospects with the company, all of which made Raygor believe that her employment was in jeopardy." Given that the ULJ provided a statutorily required reason for this credibility determination and that we must "view the ULJ's factual findings in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ, . . . we will not disturb the ULJ's factual findings . . . [here because] the evidence substantially sustains them." *Skarhus*, 721 N.W.2d at 344 (citations omitted).

Against the backdrop of these valid credibility determinations, we conclude that substantial evidence supports the ULJ's decision that Raygor quit, that she was ineligible for unemployment benefits, and that no ineligibility exceptions apply. As explained above, there is substantial evidence in the record underlying the ULJ's determinations that Stewart afforded Raygor the choice to either continue her employment or select January 3 as her last day, as well as the ULJ's finding that Raygor "chose the latter." Thus, the ULJ did not err in deciding that "[a] preponderance of the evidence shows that Raygor quit her employment" because it was her "decision for the employment to end when it ended, not the employer's." *See* Minn. Stat. § 268.095, subd. 2(a) (2024) ("A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's.").

Similarly, there is substantial evidence in the record supporting the ULJ's determinations that, "even if Stewart strongly suggested that Raygor's employment was going to end at the end of her probationary period," that suggestion "would not be a good

12

reason caused by the employer for quitting." *See id.*, subd. 3(e) (2024) ("Notification of discharge in the future, including a layoff because of lack of work, is not a good reason caused by the employer for quitting."). And substantial evidence likewise supports the ULJ's ruling that "Stewart requiring Raygor to work from the office except for on Mondays was not adverse to Raygor because it was consistent with the agreement they had from the beginning of the employment" and that any "disagreement or miscommunication [about the work-from-home rules] would not compel an average, reasonable worker to quit and become unemployed." *See id.*, subd. 3(a) (2024) (defining a "good reason caused by the employer for quitting" as a reason "(1) that is directly related to the employment and for which the employer is responsible," "(2) that is adverse to the worker," and "(3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment").

We therefore discern no error in the ULJ's order affirming its decision that "Raygor is ineligible for unemployment benefits based on her separation from Stewart & Associates" because "[a] preponderance of the evidence shows that Raygor did not quit because of a good reason caused by the employer" and "[n]one of the other exceptions to ineligibility apply."

**Affirmed.**